[L.A. No. 32063. Aug. 18, 1988.]

RICHARD C. ELDEN, Plaintiff and Appellant, v.
ROBERT LOUIS SHELDON et al., Defendants and Respondents.

**COUNSEL**

Michael L. Robins for Plaintiff and Appellant.

Dale G. Givner and Alan B. De Filippi as Amici Curiae on behalf of Plaintiff and Appellant.

Gilbert, Kelly, Crowley & Jennett, Patrick A. Mesisca, Jr., and Peter J. Godfrey for Defendants and Respondents.

Terry W. Backus, Caroline B. Newcombe and Lord, Bissell & Brook as Amici Curiae on behalf of Defendants and Respondents.

OPINION

MOSK, J.—Plaintiff Richard Elden appeals from a judgment of dismissal after the trial court sustained, without leave to amend, defendants' demurrer to his complaint alleging causes of action for negligent infliction of emotional distress and loss of consortium.

The issue presented is whether plaintiff, who witnessed the tortious injury and death of the person with whom he shared a cohabitant relationship allegedly akin to a marital relationship, may recover damages for loss of consortium and negligent infliction of emotional distress. We conclude that he may not.

The facts pleaded are few and not in dispute. In December 1982, plaintiff and Linda Ebeling were both involved in an automobile accident allegedly caused by defendant Sheldon's negligence. Plaintiff, a passenger in Ebeling's car, sustained serious personal injuries. Ebeling was thrown from the car and died a few hours later. Plaintiff filed an action against Sheldon and the owner of the automobile he was driving (defendants), alleging that at the time of the accident plaintiff had an "unmarried cohabitation relationship with the decedent . . . which was both stable and significant and parallel to a marital relationship." The complaint set forth three causes of action. The first sought recovery for plaintiff's own injuries, the second for negligent infliction of emotional distress which he suffered as a result of witnessing the injury of his "de facto spouse," and in the third cause of action he sought recovery for loss of consortium. Defendants demurred to the last two causes of action on the ground that plaintiff was not legally married to Ebeling at the time of the accident. The trial court sustained the demurrer without leave to amend and entered judgment of dismissal.[1] Plaintiff appeals.

## I. NEGLIGENT INFLICTION OF MENTAL DISTRESS

■ The first issue is whether plaintiff can maintain a cause of action for negligent infliction of emotional distress based on the fact that he witnessed the injury to Ebeling, his alleged de facto spouse.

In the landmark decision of *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], this court first held that a bystander who was not himself in danger of injury from an accident may

---

[1] After the trial court sustained defendants' demurrer, the parties settled the personal injury claim and stipulated to the entry of judgment that preserved plaintiff's right to appeal from the dismissal of his causes of action for loss of consortium and negligent infliction of emotional distress.

recover damages for negligent infliction of emotional distress as the result of witnessing an accident in which another was injured by the defendant's negligence. There, a mother observed the fatal injury of her infant daughter, and she sought to recover damages for the shock and injury to her nervous system from the event. We held that absent overriding policy considerations, the chief element in determining whether defendant owes a duty to another is foreseeability of the risk, and that it was foreseeable the mother of a young child would be in the vicinity and would suffer serious emotional shock from witnessing an injury to her child.

We suggested three guidelines, based on the plaintiff's physical, temporal and relational proximity to the primary victim at the time of the accident, to determine whether liability was reasonably foreseeable: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.* at pp. 740-741.) We further advised that no "immutable rule" could replace a case-by-case determination of the foreseeability of serious mental distress to the plaintiff.[2]

These guidelines have been applied with varying degrees of flexibility. Some courts have extended the *Dillon* holding to close relations who did not visually witness the injury-causing event and to those who arrived soon after impact. (See, e.g., *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022] [concluding *Dillon* "does not require a *visual* perception of the impact causing . . . the injury" so long as the plaintiff is a "percipient witness"]; *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 563 [145 Cal.Rptr. 657] [mother heard cry of rescuers after child fell into swimming pool and arrived on scene as child pulled from pool]; *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253, 256 [79 Cal.Rptr. 723] [mother appeared at scene of explosion within moments of its occurrence].) Others have denied recovery because plaintiff first learned of the injury from a third party, even though he was present or nearby when the injury-causing conduct occurred (see, e.g., *Justus* v. *Atchison* (1977) 19 Cal.3d 564,

---

[2] Because plaintiff was a passenger in the car and sustained physical injuries in the accident, his second cause of action for emotional distress resulting from witnessing the death of Eberling is factually distinguishable from *Dillon,* in which the plaintiff mother was not physically injured as a direct result of the impact that killed her daughter. Whether or not this is a significant difference we need not decide. The parties to this action have squarely framed the issue, both in the trial court and on appeal, as whether plaintiff can recover under the principles set forth in *Dillon,* particularly the requirement that the plaintiff and victim be closely related.

584-585 [139 Cal.Rptr. 97, 565 P.2d 122] [emotional shock resulted not from direct perception, but from being informed "after the fact" that the fetus had died]; *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728, 736 [169 Cal.Rptr. 435] [parents saw son in "dying state" immediately following electrocution]) or because the plaintiffs arrived at the scene of the accident a few minutes after it occurred (*Parsons* v. *Superior Court* (1978) 81 Cal.App.3d 506, 512 [146 Cal.Rptr. 495, 5 A.L.R.4th 826]; *Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937, 948 [137 Cal.Rptr. 619]).

These decisions have frequently been criticized for allowing recovery to turn on fortuitous circumstances, leading to harsh results. (Compare *Hathaway* v. *Superior Court, supra,* 112 Cal.App.3d 728, *Nazaroff* v. *Superior Court, supra,* 80 Cal.App.3d 553, and *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253; see generally, Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries* (1984) 35 Hastings L.J. 477, 483-487 (hereafter *Unified Compensation Theory*); Nolan & Ursin, *Negligent Infliction of Emotional Distress: Coherence Emerging from Chaos* (1982) 33 Hastings L.J. 583, 585; Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules* (1982) 34 U.Fla.L.Rev. 477.)

With regard to the third prong of the *Dillon* foreseeability test, i.e., whether the plaintiff and the victim were closely related, the cases have refused to extend recovery to friends or distant relatives of the injured person. (See, e.g., *Trapp* v. *Schuyler Construction* (1983) 149 Cal.App.3d 1140, 1142-1143 [197 Cal.Rptr. 411] [recovery denied to first cousins who were frequent playmates]; *Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576, 584-585 [195 Cal.Rptr. 902] [recovery denied to best girlfriends who alleged a relationship "akin to" natural sisters].)

However, a cause of action for emotional distress has been sanctioned on behalf of a spouse who was present when his wife was struck and killed by another vehicle (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 74-78), where the primary victim was the plaintiff's sibling (see, e.g., *Walker* v. *Clark Equipment Co.* (Iowa 1982) 320 N.W.2d 561, 562-563 [31 A.L.R. 4th 158]); *Rickey* v. *Chicago Transit Authority* (1981) 101 Ill.App.3d 439 [428 N.E.2d 596, 599]) and where a grandchild shared a close relationship with the plaintiff grandparents (*Genzer* v. *City of Mission* (Tex.App. 1983) 666 S.W.2d 116, 122).

A few cases have allowed recovery if the plaintiff and victim shared a relationship that was the functional and emotional equivalent of a nuclear family relationship. In *Leong* v. *Takasaki* (1974) 55 Hawaii 398 [520 P.2d 758, 766, 94 A.L.R. 3d 471], a child successfully stated a cause of action for

emotional distress after he witnessed an automobile strike his stepfather's mother, with whom he allegedly shared a very close relationship.

And in *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720] (disapproved on other grounds in *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 466, fn. 4 [138 Cal.Rptr. 315, 563 P.2d 871]), a foster mother was allowed to recover damages for emotional distress after she watched hospital personnel negligently administer a fatal dose of glucose solution to her foster child. Plaintiff held the child in her arms as he went into convulsions and became comatose, suffering irreversible brain damage.

The *Mobaldi* court reasoned that it is "[t]he emotional attachments of the family relationship and not legal status [that] are . . . relevant to foreseeability." (55 Cal.App.3d at p. 582.) Although the plaintiff did not share a biological relationship with the child, their relationship possessed all the attributes of a natural parent-child relationship "except those flowing as a matter of law." (*Id.* at p. 583.) The child had lived under plaintiff's care for three years, since he was five months old. Plaintiff had attempted to formally adopt the child, only to be frustrated by a county policy against the adoption of seriously ill children. The child was baptized and given the surname of his foster parents. The fact that the plaintiff and child were "closely related" also was known to some personnel at the medical center, who referred to the two as "mother and child."

Plaintiff relies on *Mobaldi, supra,* 55 Cal.App.3d 573, and on *Ledger* v. *Tippitt* (1985) 164 Cal.App.3d 625 [210 Cal.Rptr. 814], which extended the reasoning in *Mobaldi* to allow recovery for emotional distress to a plaintiff who was not married to her injured partner. The plaintiff in *Ledger* observed another motorist stab her fiancé in the chest following a verbal altercation. She rushed to his aid, and he died in her arms moments later. The couple began living together 2 years before the incident, when plaintiff was 15½ years old and her fiancé was 19. They had a son, and they planned to marry but were twice frustrated in their attempt to do so. Plaintiff also claimed to be economically dependent on the decedent.

The *Ledger* court held that "it is foreseeable, as a matter of law [citation], that when defendant drew his knife, and stabbed Richard, . . . the woman a few feet distant seated in the vehicle was likely a loved one who would suffer extreme emotional distress when Richard died in her arms." (164 Cal.App.3d at p. 646.)

Defendants, on the other hand, cite *Drew* v. *Drake* (1980) 110 Cal.App.3d 555 [168 Cal.Rptr. 65], which reached the opposite result on

facts similar to the instant matter. The plaintiff in that case witnessed the death of her companion in an automobile accident. She claimed damages for emotional trauma, alleging that she had lived for three years as his de facto spouse. In affirming the dismissal of the suit for failure to state a cause of action, the court reasoned that emotional distress to a spouse or a parent "meets the *Dillon* test because it is reasonably foreseeable that a person standing in such close relationship to the injured person may be present and suffer intense distress. . . . To allow persons standing in a 'meaningful relationship' (to use a contemporary colloquialism) to recover for emotional distress resulting in physical injury would abandon the *Dillon* requirement that '[t]he courts . . . mark out the areas of liability, excluding the remote and unexpected.'" (*Id.* at p. 557.) The *Drew* court distinguished *Mobaldi* on the ground that there hospital personnel actually "knew the nature of the relationship" between the child and plaintiff, and therefore her mental distress was reasonably foreseeable. (*Id.* at p. 558.)

Plaintiff argues that the injury to him was foreseeable under the guidelines set forth in *Dillon, supra,* 68 Cal.2d 728. Relying on the holdings in *Ledger, supra,* 164 Cal.App.3d 625, and *Mobaldi, supra,* 55 Cal.App.3d 573, he asserts that he should have been allowed the opportunity to show that he met the "closely related" prong of the *Dillon* test by proof that he and his partner had a de facto marriage. The basis of his claim of foreseeability is that in recent years there has been a marked increase in the number of unmarried cohabitants, and therefore it is foreseeable that two persons occupying the same vehicle may be unmarried cohabitants whose relationship parallels that of a legally married couple.

We have no quarrel with the factual premise of plaintiff's position. There can be no doubt that the last two decades have seen a dramatic increase in the number of couples who live together without formal marriage,[3] that some of these couples are bound by emotional ties as strong as those that bind formally married partners, and that they may share financial resources and expenses in the same manner as married couples. It may well be also that the number of such households has increased to the point that emotional trauma suffered by a partner in such an arrangement from injury to his companion cannot be characterized as "unexpected or remote." Nevertheless, we conclude, for the reasons stated below, that an unmarried cohabitant may not recover damages for emotional distress based on such injury.

[3] The incidence of cohabitation without marriage increased 800 percent between 1960 and 1970 (see *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 665, fn. 1 [134 Cal.Rptr. 815, 557 P.2d 106]), and the number of unmarried couple households almost tripled between 1970 and 1984 (U.S. Dept. of Commerce, Current Population Reports (1984) Population Characteristics, series P-20, No. 399, Marital Status and Living Arrangements: Mar. 1984, at p. 7; see also Meade, *Consortium Rights of the Unmarried: Time for Reappraisal* (1981) 15 Fam.L.Q. 223, 224, fn. 6.)

Although *Dillon* stresses foreseeability of the risk as the "chief element in determining whether defendant owes a duty to . . . plaintiff" (68 Cal.2d at p. 740), it recognizes that policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk.[4] This proposition is self-evident. It is manifest, for example, that a mother will suffer severe emotional trauma from the death or serious injury of her child in an accident whether or not she is present at the scene. The same would often be true of very close friends. Yet recovery of damages for such trauma is not allowed (*Justus* v. *Atchison, supra,* 19 Cal.3d 564; *Kately* v. *Wilkinson, supra,* 148 Cal.App.3d 576) for the sound reason that the consequences of a negligent act must be limited in order to avoid an intolerable burden on society. (See Diamond, *Unified Compensation Theory, supra,* 35 Hastings L.J. 477, 490-493; Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment* (1985) 37 Stan.L.Rev. 1513, 1522-1523, 1526.) *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858], applied this principle in rejecting a claim for loss of consortium made by the children of a woman killed in an airplane accident. A majority of this court held that foreseeable injury to a legally recognized relationship does not necessarily give rise to a cause of action, and that "social policy must at some point intervene to delimit liability." (*Id.* at p. 446.) *Baxter* v. *Superior Court, supra,* 19 Cal.3d 461, a companion case, held that the parents of an injured child are also not entitled to recover for loss of consortium.

There are several policy reasons to justify rejection of plaintiff's claim that he should be allowed to recover damages for emotional distress.

First, the state has a strong interest in the marriage relationship; to the extent unmarried cohabitants are granted the same rights as married persons, the state's interest in promoting marriage is inhibited. In a recent case holding that the wrongful death statute does not unfairly discriminate against unmarried partners, it was said: "Unmarried cohabitants with enforceable contracts for support clearly differ as a class from spouses and putative spouses. Spouses receive special consideration from the state, for marriage is a civil contract 'of so solemn and binding a nature . . . that the consent of the parties alone will not constitute marriage . . . the consent of the state is also required' [Citation.] Marriage is accorded this degree of dignity in recognition that '[t]he joining of the man and woman in marriage

---

[4] *Dillon* prefaces its discussion of foreseeability with the observation that foreseeability is of primary importance in determining whether a duty to the defendant should arise "[i]n the absence of 'overriding policy considerations.' " (68 Cal.2d at p. 739.) After determining that the emotional trauma to the plaintiff was foreseeable in that case, the opinion discusses at some length and rejects various policy arguments made by the defendant against recognition of the cause of action.

is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.' [Citation.] Consonant therewith, the state is most solicitous of the rights of spouses. [Citation.] The state affords similar protection to certain putative relationships in recognition of the good faith in which the innocent party undertook to marry. [Citation.] Unmarried cohabitants receive no similar solicitous statutory protection, nor should they; such would impede the state's substantial interest in promoting and protecting marriage." (*Nieto* v. *City of Los Angeles* (1982) 138 Cal.App.3d 464, 470-471 [188 Cal.Rptr. 31].)

This policy in favor of formal marriage was expressed in the abolition of common law marriage in 1895 (see *Estate of Abate* (1958) 166 Cal.App.2d 282, 292 [333 P.2d 200]; *Norman* v. *Thomson* (1898) 121 Cal. 620, 628 [54 P. 143]), and it has been reaffirmed in numerous cases since that time (see, e.g., *Ledger, supra,* 164 Cal.App.3d 625, 636; *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904]; *Deyoe* v. *Superior Court* (1903) 140 Cal. 476, 482 [74 P. 28]).[5]

Our emphasis on the state's interest in promoting the marriage relationship is not based on anachronistic notions of morality. The policy favoring marriage is "rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society." (*Laws* v. *Griep* (Iowa 1983) 332 N.W.2d 339, 341.) Formally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage. For example, a detailed set of statutes governs the requirements for the entry into and termination of marriage and the property rights which flow from that relationship (Civ. Code, § 4000 et seq.), and the law imposes various obligations on spouses, such as the duty of support (*id.,* §§ 242, 244). Plaintiff does not suggest a convincing reason why cohabiting unmarried couples, who do not bear such legal obligations toward one another, should be permitted to recover for injuries to their partners to the same extent as those who undertake these responsibilities.

A second basis for our determination is that the allowance of a cause of action in the circumstances of this case would impose a difficult burden on the courts. It would require a court to inquire into the relationship of the partners to determine whether the "emotional attachments of the family relationship" existed between the parties (*Mobaldi, supra,* 55 Cal.App.3d at p. 582), and whether the relationship was "stable and significant" (*Butcher*

---

[5] It is established, however, that California recognizes common law marriages entered into in states in which such marriages are valid. (Civ. Code, § 4104; *Colbert* v. *Colbert* (1946) 28 Cal.2d 276, 280 [169 P.2d 633]; *Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487, 490 [186 Cal.Rptr. 321].)

v. *Superior Court* (1983) 139 Cal.App.3d 58, 70 [188 Cal.Rptr. 503, 40 A.L.R.4th 539]). *Butcher,* which will be discussed *infra* in connection with the cause of action for loss of consortium, suggested that the stability of a cohabitation relationship could be established by evidence of its duration, whether the parties had a contract, the degree of economic cooperation, the exclusivity of sexual relationships, and whether the couple had children. In *Norman* v. *Unemployment Ins. Appeals Board, supra,* 34 Cal.3d 1, 8-10, we commented on the "difficult problems of proof" involved in determining whether a relationship is equivalent to a marriage. Authorities in this state and elsewhere have rejected the *Butcher* test as inviting "mischief and inconsistent results." (*Ledger, supra,* 164 Cal.App.3d 625, 637-639; *Kiesel* v. *Peter Kiewit & Sons Co.* (D.Hawaii 1986) 638 F.Supp. 1251, 1253-1254; *Weaver* v. *G.D. Searle & Co.* (N.D.Ala. 1983) 558 F.Supp. 720,723; *Gillespie-Linton* v. *Miles* (1984) 58 Md.App. 484 [473 A.2d 947,953]; *Feliciano* v. *Rosemar Silver Co.* (1987) 401 Mass. 141 [514 N.E.2d 1095, 1096]; *Childers* v. *Shannon* (1982) 183 N.J.Super. 591 [444 A.2d 1141, 1142-1143].)

A determination whether a partner in an unmarried cohabitation relationship may recover damages for emotional distress based on such matters as the sexual fidelity of the parties and their emotional and economic ties would require a court to undertake a massive intrusion into the private life of the partners. Further, application of these factors would not provide a sufficiently definite and predictable test to allow for consistent application from case to case.

The final justification for our conclusion is advanced in *Borer, supra,* 19 Cal.3d 441, i.e., the need to limit the number of persons to whom a negligent defendant owes a duty of care. As a New York judge commented in a 1969 decision, "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." (*Tobin* v. *Grossman* (1969) 24 N.Y.2d 609 [301 N.Y.S.2d 554, 561, 249 N.E.2d 419].) This need is especially urgent in relation to damages for negligent infliction of emotional distress resulting from injury to another. "[I]f recovery [for mental distress] is to be permitted, there must be some limitation. It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as his friends. And obviously the danger of fictitious claims, and the necessity of some guarantee of genuineness, are even greater here than before." (Prosser, Law of Torts (3d ed. 1964) § 55, pp. 353-354.)

As we have seen, the cases have generally limited recovery of damages for mental distress to the immediate family of the injured person, but a few

have extended their holdings to allow recovery by a bystander who had the "functional and emotional equivalent" of a nuclear family relationship with the injured person. Thus, recovery has been allowed to a foster mother whose relationship with her foster child was similar to that of a parent (*Mobaldi, supra,* 55 Cal.App.3d 573), and a step grandmother who was like a natural grandmother to the injured child (*Leong* v. *Takasaki, supra,* 520 P.2d 758). And in *Ledger, supra,* 164 Cal.App.3d 625, an unmarried cohabiting partner was allowed to recover such damages.

We decline to follow the rationale of these decisions for to do so would result in the unreasonable extension of the scope of liability of a negligent actor. The need to draw a bright line in this area of the law is essential, as Dean Prosser has observed. The temptation to give legal effect to close emotional ties between unrelated or distantly related persons is often strong, for it cannot be denied that in some cases such relationships offer as much affection, support and solace as is provided by immediate family members, and that the emotional trauma suffered as the result of injury to a person in such a relationship may be as devastating as that suffered by a member of the immediate family. Yet we cannot draw a principled distinction between an unmarried cohabitant who claims to have a de facto marriage relationship with his partner and de facto siblings, parents, grandparents or children. The "problems of multiplication of actions and damages" that would result from such an extension of liability (*Borer, supra,* 19 Cal.3d at p. 448) would place an intolerable burden on society.

We hold that plaintiff failed to state a cause of action for negligent infliction of emotional distress and that, therefore, the trial court did not err in sustaining the demurrer to the second cause of action. We disapprove the holding of *Ledger, supra,* 164 Cal.App.3d 625, and language in *Mobaldi, supra,* 55 Cal.App.3d 573, insofar as they are inconsistent with our conclusion.

## II. Loss of Consortium

We come, then, to plaintiff's claim that he is entitled to recover for loss of consortium even though he and the decedent had never married. *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 404-405 [115 Cal.Rptr. 765, 525 P.2d 669], held that a married person whose spouse has been injured by the negligence of a third party may recover for loss of consortium; that is, loss of conjugal society, comfort, affection, companionship and sexual relations. Plaintiff asks that we extend the holding of this case to unmarried cohabiting couples with a "stable and significant relationship . . . parallel to a marital relationship." We decline to do so.

In *Borer* this court cautioned that judicial recognition of a cause of action for loss of consortium "must be narrowly circumscribed." (19 Cal.3d at p. 444.) We advanced as reasons for this policy the intangible nature of the loss, the difficulty of measuring damages, and the possibility of an unreasonable increase in the number of persons who would be entitled to sue for the loss of a loved one. (See also *Baxter v. Superior Court, supra,* 19 Cal.3d 461.) Subsequent cases, almost without exception, both in this jurisdiction and in others, have refused to extend such a cause of action to unmarried cohabitants. (See e.g., *Ledger, supra,* 164 Cal.App.3d 625; *Lieding v. Commercial Diving Center* (1983) 143 Cal.App.3d 72, 76 [191 Cal.Rptr. 559]; *Etienne v. DKM Enterprises, Inc., supra,* 136 Cal.App.3d 487, 489; *Tong v. Jocson* (1977) 76 Cal.App.3d 603, 605 [142 Cal.Rptr. 726]; *Tremblay v. Carter* (Fla.App. 1980) 390 So.2d 816, 817-818; *Sostock v. Reiss* (1980) 92 Ill.App.3d 200 [415 N.E.2d 1094, 1095-1099]; *Sawyer v. Bailey* (Me. 1980) 413 A.2d 165, 166-169 [5 A.L.R.4th 292]; *Briggs v. Julia L. Butterfield Mem. Hosp.* (1984) 479 N.Y.S.2d 750, 758; *Haas v. Lewis* (1982) 8 Ohio App.3d 136 [456 N.E.2d 512, 513].) These cases hold that the right to recover for loss of consortium is founded on the relationship of marriage, and absent such a relationship the right does not exist.

The sole exception in this state is *Butcher v. Superior Court, supra,* 139 Cal.App.3d 58. There, the parties had never married but had lived together for almost 12 years, had 2 children, filed joint income tax returns, and maintained joint bank accounts. The Court of Appeal reasoned that the injury to the plaintiff was foreseeable, the damage was not too indirect, remote or speculative, and the argument for limiting liability made in *Borer, supra,* 19 Cal.3d 441, in the context of loss of parent-child consortium was not convincing where a de facto spousal relationship was alleged. It concluded that if plaintiff proved at trial that the relationship of the parties was stable and significant and the equivalent of a de facto marriage, she could recover damages for loss of consortium.

Contrary to plaintiff's assertion, the *Butcher* decision has not been followed in California.[6] Two federal district courts have allowed a recovery for loss of consortium even though the couples were not married, but the holdings were based on their expectation that state law would recognize such an action. In both cases, the prediction proved to be unfounded.[7]

---

[6] Two California cases held that *Butcher* was not controlling, after concluding that the parties had not proved the existence of a de facto marriage, but neither adopted *Butcher's* holding. (*Grant v. Avis Rent a Car System, Inc.* (1984) 158 Cal.App.3d 813, 817 [204 Cal.Rptr. 869]; *Lieding v. Commercial Diving Center, supra,* 143 Cal.App.3d 72, 76.)

[7] *Bulloch v. United States* (D.N.J. 1980) 487 F.Supp. 1078, relied on in *Butcher, supra,* 139 Cal.App.3d 58, was followed by several decisions of the New Jersey courts refusing to extend consortium rights to unmarried couples (*Sykes v. Zook Enterprises, Inc.* (1987) 215 N.J.Super. 461 [521 A.2d 1380, 1382-1386]; *Leonardis v. Morton Chemical Co.* (1982) 184

In addition to the virtual absence of authority to support plaintiff's position, some of the factors recited above in our discussion of the cause of action for negligent infliction of emotional distress apply equally to plaintiff's claim for loss of consortium. That is, the state's interest in promoting the responsibilities of marriage and the difficulty of assessing the emotional, sexual and financial relationship of cohabiting parties to determine whether their arrangement was the equivalent of a marriage, reinforce our conclusion that the trial court did not err in upholding the demurrer to the third cause of action. We disapprove *Butcher, supra,* 139 Cal.App.3d 58, insofar as it is contrary to our conclusion.

Neither the holding nor the policies underlying our decision in *Marvin* v. *Marvin, supra,* 18 Cal.3d 660, support a different conclusion. That case permits unmarried cohabiting couples to enforce express or implied contracts relating to a division of property or support, and holds that a court may employ equitable doctrines such as quantum meruit to compensate a homemaking partner for services rendered. The decision also holds that the Family Law Act (Civ. Code, § 4000 et seq.), which includes provisions for the division of marital property, does not apply to unmarried partners. In overruling prior decisions which denied even contract recovery to a partner in a cohabitation relationship on the ground that such an arrangement was immoral, we commented on the increase in the number of cohabiting couples and the change in society's perception of their status. We concluded, "we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many." (18 Cal.3d at p. 684.) It is evident from what we say above that our determination here is not based on a value judgment regarding the morality of unmarried cohabitation relationships.

The judgment is affirmed.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I dissent.

Bolstered by the self-evident proposition that tortfeasors' liability must be limited, the majority decide that a plaintiff who witnessed the tortious

---

N.J. Super. 10 [445 A.2d 45, 46]; *Childers* v. *Shannon, supra,* 444 A.2d 1141, 1142-1143). *Sutherland* v. *Auch Inter-Borough Transit Company* (E.D.Pa. 1973) 366 F.Supp. 127, 133-134, also allowed recovery for loss of consortium although the couple did not marry until one month after the injury. The Pennsylvania Supreme Court has not decided the issue, but a number of Pennsylvania trial courts as well as a later decision from the same federal district have refused to follow *Sutherland*. (*Curry* v. *Caterpillar Tractor Co.* (E.D.Pa. 1984) 577 F.Supp. 991, 992-994; see also *Gunter* v. *Marine Catering Co., Inc.* (W.D.La. 1985) 617 F.Supp. 1018, 1020.)

injury of the woman with whom he shared a stable and significant relationship but to whom he was not married, may not state a cause of action for negligent infliction of emotional distress or loss of consortium. They concede that this artificial limitation has no relationship to the nature or foreseeability of the plaintiff's injury, factors usually considered important in defining the perimeters of tort liability. Rather, they posit that the "no marriage—no recovery" rule is justified for policy reasons. One need barely scratch the surface of these purported policies to discover their hollowness. The convenience and certainty of a foolproof bright line is not sufficient to justify denying recovery to an entire class of deserving plaintiffs on the arbitrary ground of marital status.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], we were faced with the same general question posed by this case—the circumstances under which a plaintiff who is injured upon witnessing the tortious injury of another may recover damages against the tortfeasor. We acknowledged the need to limit liability and reiterated the well-accepted maxim that one's duty is limited by the risk which his or her negligent conduct foreseeably entails. (*Id.* at p. 739.) We further observed that foreseeability depends upon the circumstances presented by each case and "no immutable rule can establish the extent of that obligation for every circumstance of the future." (*Id.* at p. 740.) Recognizing the need for a principled yet flexible framework for limiting liability, we offered guidelines for determining foreseeability in a given case. These guidelines were based on the plaintiff's physical, temporal and relational proximity to the primary victim at the time of the accident.

It is in the context of defining foreseeability that the relationship between the primary victim and the plaintiff is relevant. *Dillon* observed that a defendant is more likely to foresee the emotional injury of a nearby person who is closely related to the primary victim than he or she is to foresee injury of an unrelated or distantly related bystander. (*Id.* at p. 741.)

The majority do not conclude that the plaintiff was unrelated or distantly related to his injured lover. Nor do they challenge the general proposition that the sheer number of unmarried cohabitants in our society makes it foreseeable that injury of an adult will result in emotional suffering by his or her intimate partner. Given the widespread reality and acceptance of unmarried cohabitation, a reasonable person would not find the plaintiff's emotional trauma to be "remote and unexpected." This should end the inquiry. The parties' closeness is only pertinent to foreseeability; once

foreseeability is established, the nature of their relationship has no logical connection to the plaintiff's legal standing.

Even if there were some relevant purpose other than assessing foreseeability to inquire into the relationship between the plaintiff and the victim, there is no rational reason to limit recovery to married persons. The majority nevertheless dredge up boilerplate policy arguments to justify denying relief to deserving but unmarried plaintiffs.

## A. The State's Interest in Marriage

The majority contend that the state's interest in the institution of marriage is inhibited to the extent unmarried persons are granted the same rights as married persons. It is difficult to fathom how granting relief to a person who is already injured, regardless of marital status, will detract from society's interest in marriage. Presumably, a person who would not otherwise choose to marry would not be persuaded to do so in order to assure his or her legal standing in a future personal injury action should that person have the misfortune of witnessing the serious injury of his or her spouse. Moreover, no one proposes any new restrictions on the recovery of married plaintiffs. Marriage would maintain its preferential status since married persons are presumed to be "closely related" for the purposes of *Dillon*. Rather, the proposal is merely to elevate unmarried cohabitants to a neutral status by permitting them to prove on a case-by-case basis that their relationship is equivalent in all relevant respects to a good marriage and equally deserving of legal protection.

We have acknowledged that society benefits from the stability and structure provided by the institution of marriage. (*Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 684 [134 Cal.Rptr. 815, 557 P.2d 106]; *Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904].) The Legislature has expressed the state's policy favoring formal marriage in statutes governing the solemnization of marriage (Civ. Code, §§ 4100-4309), and in statutes defining the rights and responsibilities of spouses (Civ. Code, §§ 5100-5138). "The state's policy in favor of marriage, however, does not imply a corresponding policy *against* nonmarital relationships." (*Norman, supra,* 34 Cal.3d at p. 14 (dis. opn. of Broussard, J.).) Nor does it imply that the values underlying the state's interest in marriage flourish only within the confines of that institution.[1]

---

[1] It is instructive to consider the rationale behind the well-accepted maxim that marriage serves as the building block of society. One commentator did so by roughly classifying the functions served by marital relationships. First, they provide the setting for procreative activity and thus act as a transmitter of culture and a means to perpetuate society. Second, they serve as cooperative economic units which increase the well-being of the spouses as well as

Nevertheless, the majority cling to the untenable notion that only married couples can create families which promote society's interests. They treat tort recovery as a benefit stemming from the marital compact as if only those persons who choose to marry have any legitimate expectation that the law recognize the value of their relationships or the depth of their feelings.[2] Not only are these assumptions offensive, but they ignore the reality of our evolving social fabric and the corresponding accommodations made in both statutory and decisional law.

While the marital relationship is accompanied by a well-defined set of legal rights and obligations, the law also protects analogous rights and obligations voluntarily undertaken by unmarried cohabitants. (*Marvin, supra,* 18 Cal.3d 660.) And the Legislature has granted unmarried cohabitants the equivalent legal rights provided marital couples in the fields of housing, credit and family relations.[3] Depriving unmarried persons of compensation for injuries in tort no more advances the state's interest in marriage than would restrictions on their acquisition of housing or credit. The trend in this state is toward *removing* legal distinctions based on marital status that serve only to burden the unmarried without advancing some corresponding societal interest.

### B. *Burden on the Courts*

The majority next express concern that courts would be unduly burdened by a standard which required them to determine whether the plaintiff has met his or her burden of proving that his or her relationship is "stable and significant." In the past, this court—including the author of the majority opinion—has soundly rejected the argument that compensation should be denied to all plaintiffs because of the difficulty of determining which plaintiffs are deserving and how much they deserve. (*Rodriguez* v. *Bethlehem*

---

that of society. Third, they serve an emotional, psychological and sexual function. The importance of these functions to the individual and to society is what makes the relationship worthy of legal protection. Some cohabital relationships serve these functions to the same extent as do marriages, and are thus equally deserving of legal recognition and protection. (Note, *Loss of Consortium: Should California Protect Cohabitants' Relational Interest?* (1985) 58 So.Cal.L.Rev. 1467, 1475-1478.)

[2] Though the majority has not directly addressed the question, presumably their position that marriage is the sine qua non to recovery would preclude any gay or lesbian plaintiff from stating a *Dillon* cause of action based on the injury of his or her partner. (Accord *Coon* v. *Joseph* (1987) 192 Cal.App.3d 1269 [237 Cal.Rptr. 873].) Clearly the state's interest in marriage is not advanced by precluding recovery to couples who could not in any case choose marriage. The categorical exclusion of same-sex couples particularly highlights the injustice of an approach that recognizes only those commitments ratified by the state.

[3] See Government Code section 12955, subdivisions (a)-(d), (f), (g) (housing); Government Code section 12955, subdivision (e) (credit for housing); Civil Code sections 7000-7021 (Uniform Parentage Act) (family relations).

*Steel* (1974) 12 Cal.3d 382, 401-404 [115 Cal Rptr. 765, 525 P.2d 669]; *Dillon, supra,* 68 Cal.2d at pp. 742-743.)[4]

The capability of courts and juries to make sensitive factual determinations is regularly demonstrated in cases, like this one, in which loss of consortium is alleged. There the trier of fact must calculate the amount of damages sustained by the plaintiff due to the intangible loss of relational interests that include love, companionship, emotional support, society and sexual relations. (*Rodriguez, supra,* 12 Cal.3d at pp. 404-405; *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 70 [137 Cal.Rptr. 863, 562 P.2d 1022].) This assessment often requires consideration of evidence concerning the quality and nature of the plaintiff's relationship with his or her partner before and after the partner's injury. (11 Cal. Practice (rev. 1976) Loss of Consortium, § 139:4, pp. 59-60; see also Annot. (1976) 74 A.L.R.3d 805.) Whether the purpose is to determine legal standing or to assess the measure of damages, the same inquiry concerning the plaintiff's relationship is made and the same kind of evidence properly considered.

In *Rodriguez, supra,* 12 Cal.3d at page 401, we held that the difficulty of measuring loss was not a sufficient justification to deny compensation, and we relied on jurors to act " 'reasonably, intelligently and in harmony with the evidence.' " (*Ibid.*, quoting *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880].) The same principles should apply here. Assessing the stability and significance of a relationship is certainly no more burdensome than quantifying subjective and intangible emotional loss, and we should have confidence in the ability of the fact finder to "separate wheat from chaff." (*Bulloch* v. *United States* (D.N.J. 1980) 487 F.Supp. 1078, 1088.)

Despite the majority's exaggerated fears of unpredictable and inconsistent results, the proposed standard would not be applied in a conceptual vacuum. As the court in *Butcher* v. *Superior Court* (1983) 139 Cal.App.3d 58 [188 Cal.Rptr. 503, 40 A.L.R.4th 539] observed, evidence of the stability and significance of a relationship can be demonstrated by reference to several objective factors, including "the duration of the relationship; whether the parties have a mutual contract; the degree of economic cooperation and

[4] See also Justice Mosk's dissenting opinion in *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858] in which he attacked the majority's use of these same justifications for holding that a child may not maintain a cause of action for loss of parental consortium. "One can only infer that the majority's true motivation is neither the claimed inadequacy of monetary compensation for this loss, nor the difficulty of measuring damages, nor the danger of disproportionate liability. These are mere window-dressing, designed to lend an appearance of logic and objectivity to what is in fact a purely discretionary exercise of the judicial power to limit the potential liability of common law tortfeasors." (P. 459.)

entanglement; exclusivity of sexual relations; [and] whether there is a 'family' relationship with children." (P. 70.) The court might also consider how the couple represents their relationship to family, friends, neighbors and coworkers; and correspondingly, how they are viewed by others.

The majority's concern about the intrusion of privacy involved in the inquiry is clearly misplaced. An unmarried plaintiff stating a *Dillon* claim (*supra,* 68 Cal.2d 728) places at issue the quality and nature of his or her relationship. Presumably, cohabiting adults can decide for themselves whether the risk that a lawsuit will result in invasion of their privacy is worth the potential recovery. Moreover, courts have the inherent discretion to fashion protective orders to protect litigants from unnecessarily intrusive inquiry. In any case, denying legal standing to an injured plaintiff is a strange way to protect him or her from intrusive litigation.

## C. *Limitation of Liability*

The majority's final justification for denying recovery is that liability must stop somewhere. As a general proposition, I agree that a line must be drawn. However, I do not share in the majority's enthusiasm for crude, bright lines. In my view, recovery should not be cut off on arbitrary, definitional grounds but on functional grounds that correspond with real loss. "As the commentators have suggested, the problem should be solved by the application of the principles of tort, not by the creation of exceptions to them. Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion." (*Dillon, supra,* 68 Cal.2d at p. 747.)

Only tortfeasors lucky enough to have injured a de facto rather than a de jure spouse benefit from a bright line based on marriage. An approach that grants recovery to those plaintiffs foreseeably and genuinely injured by a negligent defendant's acts both advances the goals of tort compensation and sufficiently limits liability. To that end, a standard based on the significance and stability of the plaintiff's relationship is workable and fair.

The majority's prediction of an ever-expanding class of "closely related" plaintiffs is just as empty now as it was in *Dillon, supra,* 68 Cal.2d at pages 743-748 and *Rodriguez, supra,* 12 Cal.3d at pages 402-403. "The teaching of those cases is that the rights of a proposed new class of tort plaintiffs should be forthrightly judged on their own merits, rather than by indulging in gloomy speculation on where it will all end." (*Borer, supra,* 19 Cal.3d at p. 460, (dis. opn. of Mosk, J.).)

## Loss of Consortium

In addition to mental distress from witnessing the death of his loved one, plaintiff allegedly suffered the distinct injury of lost consortium. For the same policy reasons utilized to deny recovery under the first theory, the majority denies recovery under the second theory as well. In addition to the policies of certainty, judicial convenience and the state's interest in promoting marriage, the majority fall back on the well-worn argument that extending liability to unmarried cohabitants is not supported by precedent. (But see *Butcher, supra,* 139 Cal.App.3d 58; *Bulloch, supra,* 487 F.Supp. 1078.)

For many years, this court and others relied on the lack of precedent to refuse to extend the cause of action for lost consortium to women. (See *Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1958) 50 Cal.2d 664 [328 P.2d 449] and cases cited therein.) Relying on the Legislature to update the law, the court clung to the common law rule which denied legal standing to women despite the crumbled foundation upon which the rule rested. The old rule defined consortium only in terms of the husband's property interest in his wife as chattel. Because the husband owed no services to his wife and the wife had no independent legal identity, she suffered no legally cognizable loss when her husband was injured. (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 125, pp. 931-932; Lippman, *The Breakdown of Consortium* (1930) 30 Colum. L. Rev. 651, 651-653.)

When the Legislature failed to correct this artifact of medieval mentality, we eliminated the inequality by entirely abolishing the common law cause of action for lost consortium. (*West* v. *City of San Diego* (1960) 54 Cal.2d 469, 475-478 [6 Cal.Rptr. 289, 353 P.2d 929].) Finally, in *Rodriguez* v. *Bethlehem Steel, supra,* 12 Cal.3d 382, we resurrected the common law action for lost consortium and made the remedy available to both men and women. Recognizing the inherent capacity of the common law to adjust to evolving social realities, we announced the obvious—that a wife's loss of consortium was in every respect equivalent to that of a husband, and equally worthy of compensation. (*Ibid.*)

The majority, however, ignore the lesson of *Rodriguez* and retreat to the unfortunate pattern of refusing to acknowledge the obsolescence of assumptions upon which existing law is based. As noted, the notion that a valid legal marriage is a prerequisite to a cause of action for lost consortium has its origin in a proprietary entitlement theory that viewed marriage as vesting in the husband a property interest in his wife's services.[5] (See Meade,

---

[5]Even courts that have expressly rejected the common law proprietary theory of consortium have perpetuated the idea that consortium "springs from the marriage contract." (See *Hitaffer* v. *Argonne Co.* (D.C. Cir. 1950) 183 F.2d 811, 816 [87 App. D.C. 57, 23 A.L.R.2d

*Consortium Rights of the Unmarried: Time for a Reappraisal* (1981) 15 Fam.L.Q. 223, 226, 241-242.) But the law no longer regards women as property nor consortium as limited to the services owed by women to their husbands. The modern view regards consortium as a package of relational interests, including love, companionship, emotional support, and sexual relations. The marital status of the plaintiff has no more bearing on his or her standing to claim injury to these interests than does age or socioeconomic status. Accordingly, there is no principled reason to perpetuate the fiction that only marital partners suffer compensable loss of consortium.

By failing to harmonize the law with present societal conditions, the majority abdicate the court's responsibility for the upkeep of the common law. As we observed in *Rodriguez, supra,* 12 Cal.3d 382, 394, " 'The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country.' [Citations.] . . . But that vitality can flourish only so long as the courts remain alert to their obligation and opportunity to change the common law when reason and equity demand it."

CONCLUSION

For the reasons stated, I would reverse the decision of the trial court and direct it to give plaintiff an opportunity to prove his causes of action for negligent infliction of emotional distress and loss of consortium.

On September 15, 1988, the opinion was modified to read as printed above.

---

1366] cert. den. 340 U.S. 852 [95 L.Ed. 624, 71 S.Ct. 80], the first case to reject the common law theory of consortium and to extend the cause of action to women.) Dictum to this effect in *Hitaffer* which is often cited can be traced to an 1889 case. (*Bennett* v. *Bennett* (1889) 116 N.Y. 584, 590 [23 N.E. 17, 19].) This assumption likely reflects the Victorian belief in the moral superiority of marriage.