247 N.J. Super. 219 (1991)
588 A.2d 1264
RONNIE BENDAR AND JOEL BENDAR, HER HUSBAND, PLAINTIFFS-RESPONDENTS,
v.
NATALIE A. ROSEN, DEFENDANT-RESPONDENT, AND ELAINE ZALE, DEFENDANT-APPELLANT.
RONNIE BENDAR AND JOEL BENDAR, PLAINTIFFS-RESPONDENTS,
v.
RICHARD BERMAN, M.D., DEFENDANT-RESPONDENT CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1991.
Decided April 3, 1991.
*224 Before Judges COLEMAN, DREIER and LANDAU.
W. Stephen Leary argued the cause for appellant Zale (Leary, Bride, Tinker & Moran, attorneys, W. Stephen Leary, of counsel, Mary Beth R. Greenhalgh, on the brief).
Donald C. Heilman argued the cause for respondents Bendar (Palmisano & Goodman, attorneys, Robert G. Goodman, on the brief).
Ronald E. Prusek argued the cause for respondent Rosen (Lomell, Muccifori, Adler, Ravaschiere, Amabile & Pehlivanian, attorneys, Ronald E. Prusek, on the brief).
Jeffrey W. Moryan argued the cause for respondent cross-appellant Berman (Connell, Foley & Geiser, attorneys, Jeffrey W. Moryan, of counsel, Ernest W. Schoellkopff, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
In these consolidated cases defendants Elaine Zale, Natalie A. Rosen and Richard L. Berman, M.D. appeal from auto negligence and malpractice judgments entered against them.
The facts may be simply stated. On April 30, 1986 plaintiff was a passenger in Zale's car when they were involved in an intersection accident with a vehicle operated by Rosen. In an earlier bifurcated liability trial, the jury returned a verdict of 90% against Zale and 10% against Rosen, obviously determining that Rosen had the green light. Plaintiff Ronnie Bendar (hereafter referred to as the plaintiff unless the context indicates otherwise), was being driven by Zale to meet a bus which was to take them to a library convention in Atlantic City. Their *225 attendance had been requested by their common employer, the Woodbridge Library.
At the time the jury was empaneled and just before the trial began, Zale belatedly raised a workers' compensation defense. Her counsel admitted error in not asserting the defense in Zale's answer or by way of a motion for summary judgment. The trial judge determined that it would be unfair to permit the motion to be made orally and without full briefing. He therefore denied it, without prejudice to renewal at the close of the trial. Counsel failed to do so, but Zale has raised it anew on this appeal. Rosen has filed a separate brief and argued the appeal solely to oppose this contention. Otherwise she joins in each point raised by Zale. Plaintiffs and Berman join in Rosen's opposition on this point.
Contrary to Zale's contention, R. 4:6-7 provides that defenses such as a bar by the exclusiveness of the workers' compensation remedy (N.J.S.A. 34:15-8) are waived if not raised by motion pursuant to R. 4:6-3, or as an affirmative defense. R. 4:5-4. See Pressler, Current N.J. Court Rules, R. 4:5-4 Comment 39 (1991). Furthermore, there is a serious question whether the workers' compensation defense would have been available at all under N.J.S.A. 34:15-36, as amended by L. 1979, c. 283 § 12, and L. 1981, c. 413 § 6. Therefore the defense was properly barred.[1]
Plaintiff was injured in the accident and was taken to a hospital where five x-rays were performed on her without a pelvic shield. Thereafter, her family doctor treated her for four months for an acute cervical sprain and a strain and contusion of the right knee and thigh.
Soon after the accident, plaintiff missed her regular menstrual period, and scheduled a visit with Dr. Fleisch who had been *226 her regular gynecologist since 1983. On May 9, 1986 Dr. Fleisch discovered plaintiff was pregnant. Upon hearing this, plaintiff became "very, very upset." She was particularly concerned that she had been x-rayed only ten days before. She explained that at the time the x-rays were taken she felt she could not have been pregnant, since three years earlier, in May 1983, defendant Berman had performed a sterilization procedure, a tubal ligation, by means of a laparoscopy during which she had been told that her fallopian tubes had been cauterized, rendering it impossible for her to conceive.[2]
On May 23, 1986, at plaintiff's request, Dr. Fleisch performed an abortion and then a new tubal ligation. As he was looking at the tubes through a telescope, he spontaneously commented, "Oh, shit. He missed the left tube." He explained that defendant Berman had cauterized the utero-ovarian ligament instead of the left fallopian tube. Plaintiff's gynecological expert, Dr. Greenberg, further testified that from the evidence it appeared that defendant Berman misidentified the utero-ovarian ligament as the left fallopian tube, constituting a "very important deviation from accepted medical standards." The ligament is a shorter, thinner structure and is of a different color than a fallopian tube. He further testified that the x-rays to which plaintiff had been exposed during the first few weeks of pregnancy had "the potential of causing congenital abnormalities."
Plaintiff's psychologist, Dr. Fink, to whom plaintiff's general practitioner had referred her in September 1986 as a result of *227 an emotional aspect he had observed from plaintiff's physical discomfort, testified that she suffered from a "post-traumatic syndrome" caused by both the April 1986 accident and the unwanted abortion. When he was asked to quantify the relative contributing roles of the two causes, Dr. Fink testified that the severity of the problem was due to the abortion, since post-traumatic stress usually disappears within a year or 18 months. Plaintiff's lingering residual emotional problem "was much more from the abortion than from the automobile accident." He claimed, however, that plaintiff discontinued treatments with him before he thought she was ready, and that his prognosis was guarded in that there "will always be residuals from this experience."
Plaintiff testified that being told that she was pregnant after having undergone the x-rays was the "shock of [her] life;" she became "hysterical" and "out of [her] mind" with worry. She testified that she decided to abort the pregnancy because of the risks posed by the x-rays and financial considerations, and that this was "the hardest decision" she ever had to make; "it was the most totally overwhelming thing that ever happened to me in my whole life." She further stated that Dr. Fleisch informed her that the x-rays created a probability that the baby would be born with something wrong, and further if she carried the baby to term, she would be forced to undergo another uterine stitch operation.
Plaintiff testified extensively concerning the effect of the accident and abortion upon her family life. She differentiated between the problems caused by the auto accident and the abortion. Soon after the accident when she got into her car she would relive the accident. Later she would be a "total wreck" when she went through the intersection where the accident occurred. The majority of her testimony, however, concerned the after-effects of the abortion and the new tubal ligation. She became an angry person, screaming at her husband and children, especially each month when she got her period. However, in August 1987, a year following the event, she stated *228 that her relationship with her husband had begun to return to where it had been before the accident.[3]
Plaintiff Joel Bendar then testified that his wife "was a totally different person" following the abortion. She would jump at him and their two children "at the least little thing." She was upset, nervous, and "always screaming;" "it was very difficult to live at that time." Although plaintiff thought that the relationships had stabilized after a year following the accident, her husband felt that her condition had only improved a little and that she still was very nervous and difficult to live with. He further confirmed that there were still physical effects remaining from the accident and that plaintiff had pain in her neck and knee.
Defendant Berman explained the tubal ligation procedure and stated that although he had little independent recollection of the professional relationship with plaintiff, he was "one hundred percent sure" that he burned the fallopian tube and not the utero-ovarian ligament. He explained that a ligament does not burn the same way as a tube, and that it could not have been grasped by him. He did explain, however, that his usual procedure was to insert a scissors and cut between the two extremes of the burn, but that the operative record showed that the scissors had jammed in this procedure and he did not want to risk having a piece of the scissors breaking off. A cut was not really necessary because he believed he "had thoroughly burned the tube." Plaintiff's post-operative examination also revealed nothing to suggest that the operation had been unsuccessful. Dr. Berman's first notice that anything was wrong was years later when plaintiff filed her lawsuit. From a review of the records, his expert declared that Dr. Berman had not deviated from acceptable standards and that plaintiff's pregnancy most probably resulted from "recanalization, a re-formation *229 of passages through tissue." This expert also rejected Dr. Fleisch's physical observation and opinion that the utero-ovarian ligament had been cauterized rather than the fallopian tube.
The 90%/10% allocation of the automobile negligence liability between defendants Zale and Rosen is not challenged by the drivers. What is before us is the second trial encompassing the malpractice liability and the damages arising from both the automobile accident and the physician's negligence. The jury determined that Dr. Berman was negligent, and the court charged that the jury should assume the drivers' negligence. Next, the jury determined that the drivers' negligence was the proximate cause of plaintiff's orthopedic injuries and set the orthopedic damages at $77,000 for plaintiff and $50,000 for her husband's per quod claim. In the answers to the next two questions, the jury further determined that both the drivers' negligence and the negligence of Dr. Berman were proximate causes of plaintiff's injuries associated with the termination of her last pregnancy. For this injury the jury awarded plaintiff $220,000 and her husband $30,000. Lastly, the jury determined that Dr. Berman's negligence was a proximate cause of plaintiff needing a second tubal ligation and awarded her $33,000 and her husband $8,000.

A.
Initially, the drivers contend that their negligence could not be a proximate cause of plaintiff's emotional injuries emanating from the abortion. To be a proximate cause, however, conduct need only be a cause which sets off a foreseeable sequence of consequences, unbroken by any superseding cause, and which is a substantial factor in producing the particular injury. Scafidi v. Seiler, 119 N.J. 93, 101, 574 A.2d 398 (1990); Model Jury Charges (Civil § 7.11); and see Kelly v. Gwinnell, 96 N.J. 538, 543, 476 A.2d 1219 (1984). The tortfeasor need not foresee the precise injury; it is enough that the type of injury be within an objective "realm of foreseeability." Koenig v. *230 General Foods Corp., 168 N.J. Super. 368, 373, 403 A.2d 36 (App.Div. 1979), certif. denied 81 N.J. 329, 407 A.2d 1203 (1979).
There is no question that Berman's negligence was a proximate cause of the abortion and its attendant consequences. The automobile defendants contend, however, that their negligence was unconnected with the abortion, since plaintiff had clearly indicated by undergoing the first sterilization procedure that she wanted no more children. They point out that she had even said that some of her reasons for undergoing the abortion were the identical reasons that she expressed for having the original tubal ligation, namely the economics of raising another child, having to undergo the uterine stitch, and having had three difficult pregnancies. If this were all that plaintiff had stated, the automobile defendants might have a valid argument. But plaintiff specifically testified that a significant consideration in her decision was the danger that the x-rays had deformed the fetus. In fact, she stated that the x-rays were "one of the major things" which influenced her decision. While causation certainly remained a fact issue, the jury could properly have resolved it against the automobile defendants.
Furthermore, these defendants argue that they could not have anticipated that plaintiff would be unaware of her pregnancy and also believed that she could not be pregnant when she underwent the diagnostic x-rays. But as noted in Prosser and Keaton, Law of Torts, § 44 at 309 (5th Ed. 1984), it is foreseeable that an accident victim may seek medical treatment and that the tortfeasor may be liable for the damaging effect of the treatment even if it was performed negligently (with certain limitations as to treatment performed so badly that it goes beyond ordinary forms of professional negligence or that there were abnormal mistakes in the treatment). Id. at 309, 312. It is also foreseeable that a victim of a tort may be particularly susceptible to injury, giving rise to the principle that a

*231 condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.
See also Prosser, supra, § 43 at 291.
The trial judge gave an extended charge on proximate cause, including concurrent cause. He determined as a matter of law "that it is foreseeable ... that a person who is involved in an automobile accident will require medical treatment, including x-rays." He told the jury that if it decided that the use of the x-rays "was a proximate cause of the plaintiff's decision to have her pregnancy terminated, then ... the termination ... and associated injuries are foreseeable consequences of the negligence of the [automobile] defendants." When we add to this instruction the unspoken but correct assumption that one may reasonably expect to encounter women who mistakenly assume they are not pregnant (whether by a failed operation, the failure of contraceptive devices, age, or any other factor), this occurrence is not so bizarre as to absolve the automobile defendants from the consequences of the failed tubal ligation if the jury determined that the use of x-rays was one of the substantial factors in plaintiff's decision.

B.
Having said this, we must explore the automobile defendants' second point, namely that the trial judge ruled that apportionment of the abortion damages between them and Dr. Berman was not reasonably possible on the evidence presented. The judge's conclusion was based upon his analysis that there was but a single injury or event, the termination of the pregnancy. He explained:
the termination of the pregnancy is the one event, is the one trauma. It is not a situation where there has been more than one trauma, not a situation as in the dog bite where there are two dogs or in a car accident where there are two automobiles.
He also stated that
there is no way to compare the negligence of the defendant's motor vehicle operator with the defendant Dr. Berman, because there has been absolutely no *232 testimony concerning the nature and type of negligence and there is absolutely no way to compare the negligence of the automobile operators with the negligence of the doctor.
We will treat these explanations separately.
We disagree with the judge's first proposition. In many cases, there is but one injury with two causes, and the jury, as required by N.J.S.A. 2A:15-5.2b, determines the percentages of fault attributable to each party. In multi-party cases it is usual for there to be but a single injury even with multiple tortfeasors.
The judge cited Hill v. Macomber, 103 N.J. Super. 127, 246 A.2d 731 (App.Div. 1968) to support his "single injury" conclusion. This case, however, does not stand for the proposition that an indivisible injury cannot be allocated between tortfeasors. Rather, it stands for the principle that liability is presumed to be joint and several unless there are either distinct harms or a reasonable basis upon which to determine the contribution of each cause of a single harm. Id. at 137, 246 A.2d 731. And see Restatement (Second) of Torts, § 433A (1965). This principle is well established in our law, and was refined in Fosgate v. Corona, 66 N.J. 268, 272-273, 330 A.2d 355 (1974), to require that where there is an aggravation of a pre-existing condition by "malpractice or other tortious act" the innocent plaintiff is not required to establish what portions of the eventual damages are attributable to each act. And see Scafidi v. Seiler, supra, 119 N.J. at 110-111, 574 A.2d 398. This principle is not limited to malpractice cases. Sholtis v. American Cyanamid Co., 238 N.J. Super. 8, 27-28, 568 A.2d 1196 (App.Div. 1989).
While we do not strictly have the aggravation of a pre-existing condition here, the principles should be the same. Plaintiff was able to conceive as a result of Berman's negligence. The jury determined from its proximate cause finding concerning the drivers' negligence that the pregnancy may well not have been terminated but for the x-rays (i.e., that the x-rays were a proximate cause of the abortion). The two events thus combined *233 to produce the intensified result in much the same manner as in the aggravation cases. Therefore, if there is a reasonable basis for apportionment, apportionment should be permitted.
Where the issue is severability of injuries, as opposed to the severability of causation for a single injury, Quagliato v. Bodner, 115 N.J. Super. 133, 139, 278 A.2d 500 (App.Div. 1971), succinctly stated that "[t]he finding as to whether, or what portion of, the injuries are indivisible is properly left to the jury." In a causation case, the rule is the same, except that a new factor is added by Fosgate, namely that "the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are." 66 N.J. at 272-273, 330 A.2d 355. Cf. Scafidi v. Seiler, supra, 119 N.J. at 111, 574 A.2d 398. We therefore conclude that while the judge was incorrect in stating that this was an indivisible injury, he properly determined that unless defendants established a proper basis in the record to allocate responsibility, there would be joint and several liability.
While the judge correctly defined this issue, we disagree with his conclusion that there "is no way to compare the negligence" of the defendants. This is precisely what a jury is asked to do when there are joint tortfeasors. In fact an earlier jury already performed the same function when it allocated the responsibility for the auto accident injuries between the two drivers.
As in any case where the culpability of the parties is not an issue, but only the proximate cause effects of their action, comparative fault requires that a jury compare the proximate cause elements to allocate responsibility. In Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 163, 406 A.2d 140 (1979), the Supreme Court determined that in allocating damages, a comparison is to be made of the proximate cause factors arising from different causes of action. In the case before us *234 we are not examining the culpability of the automobile defendants. It makes little difference here how slightly or grossly negligent either defendant may have been, so long as their responsibility was properly allocated in the earlier trial. All that is important here is that the jury determined that the injuries suffered in the accident required the use of diagnostic x-rays. Even if one of the automobile defendants had been a speeding drunken driver, it would not affect the equation in which we measure the proximate cause relating to the x-rays (an intervening event occasioned by their earlier negligent act) against the proximate cause relating to the malpractice.
We have examined plaintiff's testimony concerning the factors which led to her decision to abort the fetus, a decision which she would not have had to make at all had it not been for Berman's negligence, but one which also she might not have made were it not for the x-rays. The jury may have looked at the two factors but was unable to allocate responsibility. In such a case, 50% of the responsibility properly falls upon the physician and 50% upon the automobile defendants (who in this case split their half by a 90/10 ratio).[4]
In short, although the injury cannot be divided, the jury heard substantial testimony concerning plaintiff's motivations for the abortion, and the effect of each occurrence upon her decision. The judge should have permitted the jury to quantify the percentage of proximate cause arising from each event, if it *235 could do so. A basic unfairness may have been visited upon one of the parties if the jury might have determined that one event was primarily responsible for plaintiff's decision, and the other event only slightly responsible. We therefore must remand for a new trial concerning the apportionment of the sizeable abortion-related damages determined by the jury.[5]

C.
All of the defendants claim that the trial judge erroneously permitted plaintiffs' counsel to refer to Dr. Berman's affiliation with Princeton Insurance Co. for whom he regularly reviewed malpractice cases. The trial judge denied a mistrial motion and requested plaintiffs' counsel not to mention the carrier's name again. He permitted the general line of inquiry to be followed, since the doctor claimed to have worked 40 to 50 hours per week reviewing such files and advising Princeton Insurance Co. Plaintiff was even able to introduce a statement the doctor made during a speech that he was "slanted towards the defense." As Berman explained, he may be slanted toward the defense in reviewing a case, but when testifying in court he would tell the truth. There were no further objections after the initial objection to the mention of the insurance company, nor was there any request either for a cautionary charge or for a new trial based on this alleged error.
*236 It does not appear to us that a mention of insurance, and here not even the defendant's own insurance, warrants a mistrial. Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 577, 512 A.2d 507 (App.Div. 1986), certif. denied 107 N.J. 48, 526 A.2d 138 (1986). The trial judge ruled that the mere mention of insurance was not fatal and permitted the continued inquiry, limited to the issue of the doctor's credibility. We find the judge's handling of this problem to be a reasonable exercise of his discretion and the line of questioning a proper attempt to induce Dr. Berman to admit that he was biased towards the defense in malpractice cases. Incidentally, insofar as the doctor here was a defendant and not an expert witness, and testified primarily based upon a review of operative records from the first tubal ligation, any effect of this line of questioning most probably was minimal.[6]

D.
In defendant Berman's appeal, he argues that he should not have been found negligent for exercising "physician's judgment." We note, however, that there was no objection to the charge which employed the usual physician's standard-of-care instructions, nor was this objection raised at the motion for a new trial. This was not a case where a physician's judgment was called into question. Rather, plaintiff's theory was that the ligament rather than the tube had been cauterized. The issue was one of sharp factual disagreement in which the jury apparently accepted Dr. Fleisch's "eyewitness" testimony. This explanation also answers Dr. Berman's next argument that the verdict was against the weight of the evidence. This finding by the jury was a credibility determination resolved against Dr. Berman, with no cause for appellate intrusion. *237 Amaru v. Stratton, 209 N.J. Super. 1, 22, 506 A.2d 1225 (App.Div. 1985).
Dr. Berman also claims that he should not have been denied the right to file a belated cross-claim for contribution under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq. While technically a right of contribution does not arise until a tortfeasor has paid more than his pro rata share, Tino v. Stout, 49 N.J. 289, 298 n. 3, 229 A.2d 793 (1967), the entire-controversy doctrine and judicial economy militate for the claim being asserted in the underlying tort action. See R. 4:7-5(b), and see Pressler, Current N.J. Court Rules, R. 4:7-5 Comment (1991). The rule also allows late claims to be filed "by leave of court, which shall be freely given." While Dr. Berman omitted the claim for contribution from his answer, he was granted leave in the pretrial order to assert such a cross-claim in the event the two actions were consolidated. His inadvertence in later failing to file the claim, together with the total lack of prejudice, should have caused the trial judge to permit the late amendment, even at trial. We will deem the pleadings so amended.

E.
All of the defendants claim that the damage awards were sufficiently excessive to constitute manifest denials of justice. The drivers so claim concerning the orthopedic injury, Dr. Berman concerning the damages for the tubal ligation, and all three defendants concerning the damages for the abortion. The defendants also point to the alleged excessiveness of the $88,000 in cumulative per quod damages awarded to plaintiff's husband.
We can find no fault with the $77,000 orthopedic damage award. As noted by the trial judge, plaintiff's treating physician, Dr. Mayer, testified that plaintiff would probably suffer degenerative arthritis, thus establishing permanent orthopedic injuries. No contrary evidence was presented by the *238 defense. The judge conceded that the per quod award to Joel Bendar was "high," but in view of plaintiff's expected worsening condition, uncontroverted by the defense, the judge did not "think that it's so high that it is an obvious miscarriage of justice."
While the automobile defendants complain that the evidence showed relatively minor and controllable orthopedic injuries, we have but a narrow scope of review, and we will not upset the orthopedic damages awarded to plaintiff. The $50,000, $30,000 and $8,000 per quod awards for loss-of-services to Joel Bendar present more of a problem. Plaintiff testified that she could not do much after the accident, and her husband
had to do most everything. We had no kind of life, sexual life altogether for many months after that. He had to do the vacuuming, he had to do the cleaning, he had to do the lifting of the grocery bags, all the normal things of day-to-day life that had to be done. It put a lot of pressure on the family.
She also noted that her husband was affected emotionally since she was
very depressed all the time, ... would yell and be cranky and miserable ... it was just for no reason really, but all of the things that had happened which is so overwhelming to me that it just totally affected him. I would have no patience with him, my children.
As noted earlier, plaintiff further testified that the relationship had returned to normal a little more than a year after the accident. Joel Bendar did not testify to any loss of services attributable solely to the accident and attributed the personality decline to the effects of the abortion and second tubal ligation.
The intertwining of the per quod injuries from the accident, abortion and tubal ligation made it difficult for the jury to have allocated the per quod damages among the three events. We realize that during the initial nine days following the auto accident plaintiff's disability was caused solely by that event, and the long-term orthopedic effects were separable. After the abortion, plaintiff's disability was caused by a combination of the accident, the abortion and second tubal ligation.
Joel Bendar testified that the principal changes in plaintiff came after the abortion:

*239 She was totally different. She was a totally different person. Every little thing, she would jump at myself and our two children, at the least little thing and she was always screaming at me and very upset and nervous all the time. It was very difficult to live at that time.
He was then asked concerning how the condition changed over the years, and answered:
It has changed a little bit but it is still  it is never the way it was before. It is still  she still jumps at the least little thing. As time goes on, there are trends. Sometimes she is good, but most of the time she is very nervous about everything. Every little thing bothers her, and it is difficult to live now.
While we might look askance at the size of the $50,000 and $30,000 per quod claims, we realize that as plaintiff did suffer the orthopedic injury which may extend for her lifetime thus placing burdens on her husband, $50,000, while generous, is not assailable. Although it is surprising to us that the $30,000 per quod award for the abortion was not as generous, given the size of plaintiff's compensatory award the total of the two awards cannot be challenged. Apart from the physical effects of the orthopedic injuries on plaintiff, her husband suffered through their difficult emotional period, and has testified to residual effects which were still felt at the time of trial. We therefore sustain the $50,000 and $30,000 per quod awards.
There was no evidence concerning any direct effect on plaintiff or loss of consortium resulting from the new tubal ligation. Yet the jury made awards to both plaintiffs for that event also. While there was an invasive procedure required to perform the new tubal ligation, the $33,000 and $8,000 awards were excessive. The tubal ligation was performed at the same time as the abortion, caused no increased hospitalization or increased disability, and imposed no enforced decision upon plaintiff, since she had made this sterilization decision many years before. Yet as there was an additional invasion of her body, some compensation to plaintiff was permissible; we cannot say as a matter of law that all of the tubal ligation damages for plaintiff were subsumed within the abortion damages. An award to her husband, however, would be cumulative or speculative, since no damages to him from this cause were shown. *240 We therefore vacate his $8,000 award. We realize that only defendant Berman was responsible for the new tubal ligation, where both the drivers and Berman were responsible for the abortion. We grant remittitur sua sponte for these damages to the sum of $7,500, unless plaintiff opts for a new trial on this limited damage issue.

F.
The remaining significant point involves the $220,000 awarded to plaintiff for the abortion. We have already quoted plaintiffs' descriptions of the abortion's effect and have earlier described Dr. Fink's diagnosis and statement that the abortion was a much more important cause of plaintiff's psychological condition than the accident. It is no answer to the size of the damage award to say that by voluntarily undergoing the earlier sterilization procedure, plaintiff had already indicated that she wanted no more children. Whether she wanted no more children misses the point; she deserved the right not to be put to the decision of whether to abort the one she was carrying.
We recognize that her apprehension that the second tubal ligation would not work either, of necessity had to terminate when she had the hysterectomy a year later. Yet plaintiff's psychological condition had not totally abated, even at the time of trial, although plaintiff candidly admitted that her relationships were starting to improve commencing a year following the accident. As we noted concerning the per quod award, this was a generous jury. Still, we cannot in good conscience say that the remaining total awards of $297,000 to plaintiff and $80,000 to her husband "clearly and convincingly" demonstrate "that there was a miscarriage of justice under the law," R. 4:49-1(a), especially when this argument was heard and rejected by the trial judge who saw and heard the witnesses.
In summary, we vacate the husband's award for the tubal ligation operation of May 23, 1986 in the amount of $8,000 on the basis that there was no factual support for separate damages *241 attributable to this event. We grant remittitur to the sum of $7,500 for plaintiff's damages for the second tubal ligation, unless she elects a new trial on this issue. We affirm the remaining damage awards. We reverse the decision to preclude apportionment of the abortion damages, and remand this matter for a new trial on the single issue of the allocation of the $220,000 award to plaintiff and $30,000 per quod award to her husband. Responsibility shall be apportioned between the auto accident resulting in the diagnostic x-rays on one hand (to be divided 90/10 between defendants Zale and Rosen, respectively), and Dr. Berman's malpractice on the other.
The judgments appealed from are vacated in part, remitted in part, reversed and remanded for a new trial in part, but otherwise affirmed.
NOTES
[1] With this issue concluded, unless the context otherwise requires, we will refer generally to the joint arguments of the defendant drivers, rather than to either Zale or Rosen.
[2] Plaintiff's motivation for the sterilization procedure was that she had had three difficult pregnancies. The first resulted in a healthy child; the second ended in a miscarriage, and the third resulted in a full-term delivery only after an operative procedure where the mouth of the womb was stitched so that she would not again miscarry. Furthermore, the second child, although otherwise normal, was born with only one ear. Plaintiff and her husband then decided that she would undergo the tubal ligation performed by defendant Berman. She later switched gynecologists to Dr. Fleisch when she moved from the area where Dr. Berman had his office.
[3] At that time she also had to undergo an emergency hysterectomy because of a fibroid tumor.
[4] Berman has suggested that the division should be one-third each. We reject this conclusion. Its absurdity can be easily demonstrated by viewing the same case, with the same actions by the doctor, but changing the fact of a two-car accident to a ten-car pile-up, with all of the drivers negligent, and requiring the same diagnostic x-rays. Should the physician then be responsible merely for 1/11th of plaintiff's damages? Alternatively, if instead of a 90/10 liability verdict, defendant Rosen had been exonerated, should that remaining two-defendant case be the only circumstance under which defendant Berman would be responsible for 50% of the damages? It is evident that the focus must be on the two occurrences, not the number of parties which may have been responsible for each.
[5] This problem is akin to aggregation rules determined to the contrary in Van Horn v. William Blanchard Co., 88 N.J. 91, 438 A.2d 552 (1981), which were overturned by L. 1982, c. 191, § 1. Our decision does not involve a plaintiff's negligence, and therefore Van Horn is inapposite. Yet the reasoning in one case discussed in Van Horn is drawn into question. In Rawson v. Lohsen, 145 N.J. Super. 71, 77-78, 366 A.2d 1022 (Law Div. 1976), the court rejected a "joint venture" theory governing the maintenance of a defective traffic light by two municipalities. Even under the law as it then existed, the entity of the defective light was 50% responsible for the accident, much as the x-rays in the case before us are to be determined partially responsible for the abortion. The conduct behind the defective object need not be reevaluated. To the extent that Rawson is inconsistent with this analysis, it is disapproved.
[6] We note that the objections made at trial were solely Dr. Berman's. Yet the issue has been raised here by the drivers as well, without noting, as required by R. 2:6-2(a)(1), that they had not raised the issue before the trial judge.