RUTH PARKINSON, PETITIONER-APPELLANT, v.
J. & S. TOOL COMPANY, RESPONDENT-RESPONDENT.

Argued September 11, 1973—Decided January 2, 1974.

*Mr. Jack Mandell* argued the cause for appellant Ruth Parkinson (*Messrs. Balk, Jacobs, Goldberger, Mandell & Seligsohn,* attorneys).

*Mr. Roland Vreeland* argued the cause for respondent J. & S. Tool Co. (*Messrs. Connolly, Vreeland & Connolly,* attorneys).

The opinion of the Court was delivered by

PASHMAN, J. This is an appeal by Ruth Parkinson from a judgment of the Appellate Division which affirmed a denial of dependency benefits by the Judge of Compensation. Appellant, though not legally married, was living as husband and wife with decedent Richard Parkinson, who, it is conceded, died from an accident arising out of and in the course of his employment. *N. J. S. A.* 34:15-7. We granted certification. 63 *N. J.* 328 (1973).

The sole issue is whether claimant is a "dependent" within the terms of *N. J. S. A.* 34:15-13(f) according to guidelines we enunciated in *Dawson v. Hatfield Wire & Cable Co.,* 59 *N. J.* 190 (1971).

Ruth and Richard Parkinson, lifelong Roman Catholics, were legally married before a Roman Catholic priest in 1927. Two children were born of this marriage which terminated in 1939 when Ruth obtained a divorce decree in the New Jersey courts. Richard thereupon left the state but returned in 1950 to resume life with Ruth and their children. Prior to doing so, and as a step toward remarriage, the couple visited the pastor of their local church, informed him of the divorce and requested that he remarry them. Consent to remarriage was withheld. The priest explained that they were "already married in the eyes of God." The couple accepted the priest's explanation, assumed they were married and resumed cohabitation. No civil ceremony followed.

Appellant testified that she understood the nature of her divorced status under the law, that she was no longer legally married. In the eyes of the Catholic Church, however, a religious ceremony lasts until death; only ecclesiastical authority can dissolve or annul the marriage. Monsignor Smith, an ecclesiastical attorney and expert on canon law, testified that the advice offered by the pastor, since deceased, would be the church's teaching as regards marriage. People reconciled after a divorce and returning to the same authority which married them initially is such an uncommon occurrence that most priests, even those more steeped in canon and civil law, are unqualified to grapple with its legal disposition. Since

there is no canon covering these facts, even when proper advice is afforded, no new marriage occurs. On cross-examination, the Monsignor offered what would be his advice to such a couple: a "renewal of consent," *i. e.,* an expression of matrimonial consent by recalling their original marriage vows, coupled with obtaining a new marriage license. In the eyes of the church, it is not a new marriage, but merely a repetition of what already has occurred. It would suffice however for the civil authorities.

The Judge of Compensation found, however, that while the couple had remained married in the eyes of God, and recognized as a marital entity by the public, the civil authority, by virtue of the divorce, did not accept the remarriage. Accordingly, under strict statutory law, Ruth Parkinson did not qualify as a dependent for workmen's compensation benefits. The Appellate Division agreed and rejected appellant's contention that she qualifies as a *de facto* wife under *Dawson, supra.* For reasons hereinafter stated, we reverse, and remand to the Division of Workmen's Compensation for an award of death benefits.

The relevant Workmen's Compensation statute, *N. J. S. A.* 34:15–13(f) provides in part:

The term "dependents" shall apply to and include any or all of the following who are dependent upon the deceased at the time of accident or the occurrence of occupational disease, or at the time of death, namely: . . . wife . . .[1]

---

[1]The other named dependents are as follows: husband, parent, stepparents, grandparents, children, stepchildren, grandchildren, child in esse, posthumous child, illegitimate child, brothers, sisters, half brothers, half sisters, nieces, nephews.

Legally adopted children shall, in every particular, be considered as natural children. Dependency shall be conclusively presumed as to the decedent's widow and to the natural children under 18 years of age of a male or female decedent who were actually a part of the decedent's household at the time of his death.

Appellant concedes that she is not a lawful *de jure* widow, but respectfully urges that we accept her claim as a *de facto* widow, and therefore should be entitled to benefits under the reasoning we have set forth in *Dawson*. In that case, Mamie Dawson, legally married to decedent Charles Dawson in 1949, brought a dependency claim following his fatal work-connected injury. At the Compensation hearing, employer challenged Mamie's rights to dependency benefits, attacked her marriage as meritricious, and offered that decedent had previously been married in 1942, had fathered two children and had never secured a divorce. Dependency benefits were denied. The lower courts reasoned that a knowingly meretricious relationship is generally sufficient to defeat recovery. Justice Mountain, for the majority, fashioned an equitable result and reversed. He pointed out that the claimant entered her relationship in complete good faith, with no suspicion, let alone knowledge, of decedent's prior marriage. The couple had lived together in an open and unchallenged relationship as man and wife until decedent's death. The evidence was uncontradicted that Mamie Dawson had been dependent on decedent. It was only after the latter's death that employer challenged this relationship, and then only to be relieved of its dollar liability. We there concluded that the terms "wife" and "widow" as used in the statute include *de facto* widows where good faith coalesces with ". . . a *de facto* relationship of man and wife continuing unbroken over an extended period of years having had its genesis in a ceremonial marriage . . ." 59 *N. J.* 196.

The Appellate Division refused to apply the *Dawson* rationale because Ruth and Richard Parkinson lacked the "ceremonial" requisite. Justice Mountain stated in *Dawson*:

. . . We deem it significant that petitioner and decedent entered upon a ceremonial marriage carrying with it, as all ceremonial marriages do in varying degree, elements of solemnity, publicity and prior deliberation not characteristic of a common law union. *Id.* at 196.

Employer maintains that without the ceremonial marriage, *Dawson* is inapplicable, for otherwise the Court would be creating a paradox. It would allow claimant to use the legal system when it suits her — to secure a divorce and obtain compensation benefits — but to ignore it for purposes of the ceremonial marriage requirement. To employer, this would flout the fairness and equality of our system of laws.

We disagree. This position misreads both the underlying rationale of the marriage ceremony and the equitable policies we postulated in *Dawson*.

Solemnity, publicity, and deliberation distinguish a legitimate marriage ceremony from an illegitimate common law union. Inherent in the common law marriage are a nonrecognition of the legal process, and a lack of commitment which often gives rise to an impermanent and ephemeral arrangement, such that economic support, let alone dependency, may be withheld randomly. The union, which in the eyes of the public remains an uncertainty, may dissolve at any time. Such a couple may not both use an identical surname, file joint tax returns, or be deemed an entity for census-taking, welfare or social security eligibility. Oftentimes while they both may reside at one address, only one name may appear, and the other party may have legal residence elsewhere. Children of such union, moreover, might be deprived of parental guidance since they may never be certain who are their real parents. The Legislature and this Court have both declared that common law marriages are prohibited. *N. J. S. A.* 37:1–10;[2] *Dacunzo v. Edgye,* 19 *N. J.* 443 (1955); *Lopez v. Lopez,* 102 *N. J. Super.* 253 (Ch. Div. 1968).

---

[2] This statute says in part:

All common law marriages entered into after December 1, 1939 are invalid . . . and failure in any case to comply with both prerequisites (license and marriage performed by one authorized to solemnize marriages) which shall always be construed as mandatory and not merely directory, shall render the purported marriage absolutely void.

A different drama unfolds in the situation before us. Prior to resuming cohabitation in 1950, Ruth and Richard Parkinson, after some deliberation, visited a priest, expecting to arrange for a second church wedding They had initiated the nuptial process with such a visit once before in 1927. As lifelong Roman Catholics, they were sensitively aware of this requirement. With but a limited sixth-grade parochial school education, however, Ruth was somewhat unsophisticated in understanding the interrelationship between the dual civil and religious mantles cloaking the priest. She had sufficient knowledge that the first ceremony performed by the priest was legally sanctioned. She had little reason to believe differently this time when informed that her marriage was still recognized "in the eyes of God." Words to this effect were expressed in the earlier marriage. Having been uttered by one legally considered an authoritative voice, Ruth and Richard accepted without question its plain and purported meaning. To all parties concerned, it was tantamount in both tenor and spirit to a veritable ceremony. Hence a re-affirmance of the earlier marriage was effectuated.

It has been contended that Ruth was opportune in utilizing the legal system. When she secured the divorce, she showed no hesitation in going to the courts; when she sought to re-marry, she ignored the civil authorities. Such reasoning might be relevant if Ruth's legal status were at issue. But it is the "good faith wife" that concerns the Court. And nowhere has it been implied that petitioner lacked the reasonable and sincere belief in fulfilling this role, nor been suggested that she disregarded the duties and responsibilities of the marital institution.

*Dawson* speaks of good faith where the spouse thinks she is a wife, fulfills the role of a wife, is treated by the decedent as a wife, and is the dependent widow whom the Legislature seeks to aid. Her needs have been the same, and have arisen in the same way, as if the divorce had never occurred, and as if the priest had married them *de novo*. It is understandable

that given Ruth Parkinson's limited sixth-grade education, she acted no differently than any one else in her position. When she wanted a divorce, she went to see a lawyer; when she wanted to get married, she went to see a priest. What could be more logical to a simple person with an inveterate Roman Catholic background? We do not question that for Ruth and Richard to be legally man and wife she would have had to comply with our marriage statute. That is not subject to argument. But she does not claim to have been a legal wife, rather a *de facto* one. Ruth Parkinson fulfills the good faith condition of the *de facto* spouse we have set forth in *Dawson*.

*Dawson* dealt with a putative marriage which is one contracted in good faith and in ignorance, on one or both sides, of existing impediments which render it unlawful. *Black's Law Dictionary* (4th Ed. 1968), p. 1402. In *Dawson*, only one of the parties possessed good faith upon entering the marital union. Charles Dawson acted meretriciously by concealing his undissolved marriage. It was this impediment surfacing for the first time at the workmen's compensation hearings which made the marriage putative. But for the fact that employer made known this information, it might have gone forever unnoticed; for Dawson's first wife, content all these years to remain in Georgia, did not come forward to present a rival claim nor did she after she was located by respondent.

Ruth and Richard Parkinson withheld nothing from each other. No concealed impediments nor factors known to either party challenged otherwise legitimate aspects of the marriage. It was the priest, a third party, whose misguided decision proved inaccurate. Yet this marriage is devoid of any putative characteristics. Therefore, both Ruth and Richard had the *bona fides,* if not the strict legal requirement; in *Dawson,* only the widow-claimant acted *bona fide.* Lack of strict legal requirements was not the fault of Ruth Parkinson. To deny her benefits for the unintentional mistake of another

is seriously to penalize her for a wrong she did not wilfully commit. This is the very antithesis of the beneficent purposes for which our compensation statute speaks. We pointed out in *Dawson*:

Workmen's Compensation legislation seeks to place upon industry the burden of bearing the loss inevitably resulting from accidents arising out of the business employment relationship . . . [when] such loss is occasioned by the work-connected death of an employee upon whom a wife — *or one living in such a relationship* — has been economically dependent . . . The test of the relationship of husband and wife should not be quite the same in the context of this type of law, designed to supply a social need and to remedy a social evil, as in the area of familial law where questions of property, inheritance, legitimacy of offspring and the like rightly demand a more rigid adherence to conventional doctrine. (Emphasis added). 59 *N. J.* at 196–197.

We deem it significant that here, no rival claim has been made. In all other respects, the elements set forth in *Dawson* are pertinent: that petitioner's and decedent's cohabitation from 1950 to the date of decedent's death in 1968 had its "genesis" in the ceremonial marriage of 1927 and which was revived by the renewal of consent in 1950.

Compensation benefits are essentially a substitute for the financial support that a working man provided for his dependents during his lifetime. Ruth Parkinson is entitled to a continuation of this support.

What we have established here is the applicability of the principle articulated in *Dawson* to facts equally as compelling, and whose equities demand our same strong considerations. The putative spouse doctrine is designed, in many instances, to effect equity and justice. In this unique and very delicate area, the law often disregards the difference between a valid and an invalid or void marriage, recognizing instead the extralegal category of *de facto* spouse. See *Holland America Insurance Co. v. Rogers,* 313 *F. Supp.* 314 (N. D. Calif. 1970); *Gibson v. Hughes,* 192 *F. Supp.* 564, 569–570 (S. D. N. Y. 1961); *Schotte v. Schotte,* 203 *Cal. App. 2d* 28, 33, 21 *Cal. Rptr.* 220, 224 (1962). As the Court in *Brennfleck*

*v. Workmen's Comp. App. Bd.,* 3 *Cal. App. 3d* 666, 84 *Cal. Rptr.* 50 (1970) stated:

Logically, there does not seem to be any good reason why a putative spouse who believes that she is married and who lives with the putative husband, taking care of his household and him just as a legal wife would do, should not receive the same death benefits as a legal wife did. There is a fundamental unfairness in treating such a putative wife who has reason to believe and in good faith believes that she is the workman's wife, as does he, differently from a legal wife. 84 *Cal. Rptr.* at 53.

Sufficient harm befalls a putative spouse, as in *Dawson,* who learns for the first time at the workmen's compensation hearing that the man with whom she lived and to whom she devoted her life had concealed from her material facts about his life and commenced with her a marital life predicated upon a false pretence.

It is ignominious and enough of an injustice that such a deceit may embitter a widow and tarnish whatever memories and legacies she has without the exacerbation of denying her dependency benefits.

Ruth Parkinson, too, has lived since 1950 a relatively secure life and has always considered herself legitimately married to the deceased. No policy is furthered by our sanctioning the employer to withhold compensation. We are doing nothing more today than fitting the facts of Ruth Parkinson to the rationale we established in *Dawson.*

This decision reflects a continuation of that liberal trend which is the hallmark of our courts in the area of workmen's compensation. We are fully cognizant of the pervasiveness of compensation benefits, and the integral part it plays in the life of the workingman and his family in our increasingly industrial society. Its remedial goals remove from society a burden which it would otherwise have to maintain, and relieve it of the care and support of the public charge. *Stellmah v. Hunterdon Co-Op. G. L. F. Serv. Inc.,* 47 *N. J.* 163 (1966); *Petrozzino v. Monroe Calculating Machine Co., Inc.,* 47 *N. J.*

577 (1966); *Maver v. Dwelling Managers Co.,* 34 *N. J.* 440, 443 (1961); *Renshaw v. United States Pipe & Foundry Co.,* 30 *N. J.* 458, 465 (1959); *Tocci v. Tessler & Weiss, Inc.,* 28 *N. J.* 582, 586 (1959); *Howard v. Harwood's Restaurant Co.,* 25 *N. J.* 72 (1957); *Morris v. Hermann Forwarding Co.,* 18 *N. J.* 195, 197–198 (1955). In the early decision in *Splitdorf Electrical Co. v. King,* 90 *N. J. L.* 421 (Sup. Ct. 1917), the words of the statute were strictly construed and that court showed a reluctance to impose unnecessarily an added obligation upon the employer by refusing to extend the Act's coverage to an illegitimate child of deceased's daughter. Since that case the workmen's compensation laws with regard to death benefits have come a long way. We have emphasized that the reason and spirit of the Act rather than its letter must prevail. *Close v. Kordulak Bros.,* 44 *N. J.* 589, 604 (1965); *Silagy v. State,* 105 *N. J. Super.* 507 (App. Div. 1965); *Hannigan v. Goldfarb,* 53 *N. J. Super.* 190, 195 (App. Div. 1958).

Our equitable and humanitarian approach is predicated on a sensitive but frank awareness of the failings of the human being. By such a recognition we are insuring to the greatest extent possible the fulfillment of the high purposes of our socially important and ever broadening compensation act.

Reversed.

CLIFFORD, J. (dissenting). This opinion is not the occasion for lengthy reflection on the social and legal justification for the recognition of common-law marriage, adverted to in a different context by Justice (then Judge) Francis in *Danes v. Smith,* 30 *N. J. Super.* 292, 298–299 (App. Div. 1954). Suffice it here to emphasize that the legislature, in *N. J. S. A.* 37:1–10, has declared that in any marriage entered into after December 1, 1939 the contracting parties must obtain a marriage license and the ceremony must be performed by or before one authorized to solemnize marriages; "and failure in any case to comply with both prerequisites aforesaid, which shall always be construed as man-

datory and not merely directory, shall render the purported marriage absolutely void."

The majority agrees that for petitioner and decedent to have "legally" been man and wife, they would have had to comply with the marriage statute. The language of that statute is "broad and sweeping" and its terms are "unusually peremptory," *Dacunzo v. Edgye*, 19 *N. J.* 443, 450 (1955). However, the Court puts aside the legal requirements for the relationship of "wife" as one of those dependent upon the deceased workman at the time of the accident, *N. J. S. A.* 34:15–13(f), and again bestows its judicial blessing upon a *de facto* relationship on the authority of *Dawson v. Hatfield Wire & Cable Co.*, 59 *N. J.* 190 (1971).

I find no authority prior to *Dawson* for carving out a *de facto* marriage relationship for the singular purpose of creating a status entitling one to dependency benefits. Chief Justice Weintraub pointed out in his concurring opinion in *Dawson* that when the compensation statute speaks of a "wife," he assumed "for present purposes that a *de jure* wife was intended," 59 *N. J.* at 198; but he was of the view that the employer lacked the necessary standing to challenge the validity of the ceremonial marriage in that case. Justice Francis, concurring and dissenting in part, likewise saw the doctrine of a *de facto* wife being accorded the status of a lawful wife for purposes of workmen's compensation as "contrary to the intention of the Legislature and the express language of the Workmen's Compensation Act," 59 *N. J.* at 200. He said:

> Thus there comes into existence a *quasi*-marital status which was hitherto unknown to, and in fact contrary to, the law of our State, and which is to be employed in the administration of death benefits under the Workmen's Compensation Act. As I see the legislative intention under that act and under the public policy revealed by our marriage laws, a woman is either a legal wife or she is not a wife. Unless the parties are competent to marry and actually comply with the statutory ceremonial prerequisites, they do not become husband and wife regardless of the good faith attending their assumption of the relationship. To illustrate, no matter how fervently and sin-

cerely a man and a woman agree to become husband and wife and to live together as such, in New Jersey they never acquire that status legally regardless of the length of time they live together. The Legislature has condemned common law marriage as "absolutely void." *N. J. S. A.* 37:1–10.

I agree with this perception of the legislative intention under the Workmen's Compensation Act.* It thus leads me to conclude that petitioner has failed to establish that she was the lawful wife of decedent. I therefore reach the same result as did the Judge of Compensation and the Appellate Division and would deny dependency benefits under *N. J. S. A.* 34:15–13.

HALL, J., concurs in the result.

*For reversal*—Acting Chief Justice JACOBS and Justices HALL, SULLIVAN, and PASHMAN—4.

*For affirmance*—Justice CLIFFORD—1.

---

*I should add that I also find Justice Francis's analysis and reasoning in *Dawson* compelling and would have been drawn to the same conclusion as he and on the same basis — that is, the strong presumption of validity of the second ceremonial marriage fortified by a presumption that the first marriage was terminated by divorce.