642 A.2d 372

EILEEN M. DUNPHY, PLAINTIFF–RESPONDENT, v.
JAMES L. GREGOR, DEFENDANT–APPELLANT.

Argued October 13, 1993—Decided June 2, 1994.

*Donald S. McCord, Jr.*, argued the cause for appellant (*O'Donnell, McCord, Helfrich & Bangiola*, attorneys).

*William J. Vosper, Jr.*, argued the cause for respondent.

*E. Drew Britcher* submitted a brief on behalf of *amicus curiae*, Association of Trial Lawyers of America—New Jersey (*Stern, Steiger, Croland, Tanenbaum & Schielke*, attorneys; *Mr. Britcher* and *Armand Leone, Jr.*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

Many states, including our own, recognize the tort commonly referred to as "bystander" liability. Bystander liability allows recovery for the emotional injury suffered by a person, who, as a bystander, witnesses the wrongful death or serious physical injury of another person with whom the bystander had a close, substantial, and enduring relationship. In this case, the central inquiry focuses on the nature of that relationship. The specific issue presented is whether bystander liability allows recovery by a person who was not legally married to a deceased victim but who cohabitated with and was engaged to marry the decedent.

The issue is sharpened by the conflicting opinions of the lower courts. The trial court ruled that an action for negligent infliction of emotional distress was not available to a claimant who was neither married to nor involved in an intimate familial relationship with the decedent. The Appellate Division ruled that a jury should be allowed to determine whether the relationship of cohabitants engaged to be married was the functional equivalent of an intimate familial relationship. 261 *N.J.Super.* 110, 617 *A.*2d 1248 (1992). A dissent in the Appellate Division expressed the view that only persons legally married would be entitled to such a cause of action. *Id.* at 125, 617 *A.*2d 1248.

The appeal is before this Court as a matter of right because of the dissenting opinion. *R.* 2:2–1(a)(2).

## I

Eileen Dunphy and Michael T. Burwell became engaged to marry in April 1988 and began cohabitating two months later. The couple set a date of February 29, 1992, for their wedding. On September 29, 1990, the couple responded to a friend's telephone call for assistance in changing a tire on Route 80 in Mount Arlington. As Michael changed the left rear tire of the friend's car on the shoulder of the roadway, he was struck by a car driven by defendant, James Gregor. After being struck by the vehicle, his body was either dragged or propelled 240 feet. Eileen, who had been standing approximately five feet from Michael, witnessed the impact, and ran to him immediately. Realizing that he was still alive, she cleared pebbles and blood from his mouth to ease his breathing. She attempted to subdue his hands and feet as they thrashed about, all the while talking to him in an effort to comfort him. The following day, after a night-long vigil at Dover General Hospital, Eileen was told that Michael Burwell had died as a result of his injuries. Since the accident, Eileen has undergone psychiatric and psychological treatment for depression and anxiety. She instituted an action seeking to recover damages for the "mental anguish, pain and suffering" experienced as a result of witnessing the events that led to the death of her fiance.

Eileen testified at her deposition that both she and Michael had taken out life-insurance policies making each other beneficiaries. They had maintained a joint checking account from which they had paid their bills, and also they had jointly purchased an automobile. In addition, Michael had asked her several times to elope with him, and he had introduced her in public as his wife.

## II

In *Portee v. Jaffee*, 84 *N.J.* 88, 417 *A.*2d 521 (1980), this Court first recognized a cause of action for the negligent infliction

of emotional injury experienced by a bystander who witnessed the wrongful death of another person. A mother suffered horrendous emotional trauma as a result of watching her seven-year-old son suffer a slow and agonizing death after becoming trapped in an elevator. The Court sustained the mother's right to bring a negligence action for the infliction of emotional injury against the landlord and the elevator company, although she herself had not been subjected to any risk of physical harm. *Id.* at 101, 417 *A.*2d 521. In recognizing a bystander's cause of action for the negligent infliction of emotional injury, the Court cited approvingly to *Dillon v. Legg,* 68 *Cal.*2d 728, 69 *Cal.Rptr.* 72, 441 *P.*2d 912 (1968), in which the California Supreme Court allowed a mother to recover damages for the emotional injury she had suffered from witnessing the wrongful death of her daughter. The California court, acknowledging that the mother had been a mere bystander to the tragedy, specifically noted that the horror of the event bore uniquely on her because the victim had been her own daughter and because she had been near the accident and had actually observed its occurrence. Those considerations shaped the standard adopted by the court to govern a cause of action for the infliction of emotional injury. *Dillon, supra,* 69 *Cal.Rptr.* at 80, 441 *P.*2d at 920.

In *Portee,* we adopted a similar standard. *Portee* set out a four-factor test for determining a cause of action for negligent infliction of emotional distress. For a bystander-claimant to prevail, the claimant must demonstrate "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between the plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." 84 *N.J.* at 101, 417 *A.*2d 521.

In *Portee,* we explained the importance of the existence of an intimate familial relationship between the plaintiff and the victim as the basis for recovery:

It is the presence of deep, intimate, familial ties between the plaintiff and the physically injured person that makes the harm to emotional tranquility so serious and compelling. The genuine suffering which flows from such harm stands in stark contrast to the setbacks and sorrows of everyday life, or even to the apprehension of harm to another, less intimate person. The existence of a marital or intimate familial relationship is therefore an essential element of a cause of action for negligent infliction of emotional distress.

[*Id.* at 98–99, 417 *A.*2d 521 (footnotes omitted).]

The Appellate Division understood *Portee* to mean that the law "should not ignore the fact of a deep emotional attachment between ... any two persons who share an adequately earnest emotional commitment in a relationship that is functionally equivalent to familial." 261 *N.J.* at 123–24, 617 *A.*2d 1248. Accordingly, the majority below held that the marital or intimate-familial-relationship standard that was applied in *Portee* to a parent and child also encompassed the relationship between plaintiff and her fiance. *Id.* at 123, 617 *A.*2d 1248.

The dissent below interpreted the *Portee* requirement of a "familial relationship" as one restricted to marriage or blood ties. 261 *N.J.Super.* at 125, 617 *A.*2d 1248 (Muir, J.A.D., dissenting). It noted that the California court, which authored *Dillon, supra,* has since refused to extend the cause of action for negligently-inflicted emotional distress to persons in a cohabitant relationship. *Ibid.* (citing *Elden v. Sheldon,* 46 *Cal.*3d 267, 250 *Cal.Rptr.* 254, 758 *P.*2d 582 (1988)). The dissent concluded that our courts should similarly limit bystander liability. *Ibid.*

As in this case, the plaintiff and the decedent in *Elden* were cohabitants and were involved in a relationship that the plaintiff claimed was similar to a marital relationship. 250 *Cal.Rptr.* at 257–58, 758 *P.*2d at 585. They were riding together in a car when it was struck by the defendant's car, throwing the decedent from the vehicle and fatally injuring him. The plaintiff brought an action to recover for the negligent infliction of emotional distress resulting from witnessing her fiance's fatal injuries. *Id.* at 254–55, 758 *P.*2d at 582–83.

In rejecting the cohabitant's claim, the California Supreme Court stressed the need for a "sufficiently definite and predictable test to allow for consistent application from case to case." *Id.* at 260, 758 *P.*2d at 587. It reasoned that to allow recovery for emotional distress to those outside of the victim's immediate family "would result in the unreasonable extension of the scope of liability of a negligent actor." *Id.* at 260, 758 *P.*2d at 588. It determined that it must draw a "bright line" to limit the scope of liability of a negligent actor, and it therefore restricted bystander liability to persons who were legally married or related.

The court in *Elden* was reacting to the experience of the California courts with bystander liability under the *Dillon* standard. After *Dillon,* California courts had expanded nearly all the boundaries of liability set out in the several prongs of the *Dillon* analysis. See, *e.g., Ochoa v. Superior Court,* 39 *Cal.*3d 159, 216 *Cal.Rptr.* 661, 703 *P.*2d 1 (1985) (permitting recovery even though injury-producing event was not sudden or accidental); *Molien v. Kaiser Foundation Hospitals,* 27 *Cal.*3d 916, 167 *Cal.Rptr.* 831, 616 *P.*2d 813 (1980) (eliminating "sudden occurrence element" for "direct victim" plaintiffs); *Krouse v. Graham,* 19 *Cal.*3d 59, 137 *Cal.Rptr.* 863, 562 *P.*2d 1022 (1977) (ruling that plaintiff need not visually perceive third-party injury to recover); *Nazaroff v. Superior Court,* 80 *Cal.App.*3d 553, 145 *Cal.Rptr.* 657 (Ct.1978) (broadening concept of contemporaneous observation). *Elden* thus came after a marked expansion of the applicability of bystander liability.

The California Supreme Court's perception that bystander liability had become too expansive and burdensome was exemplified in *Thing v. La Chusa,* 48 *Cal.*3d 644, 257 *Cal.Rptr.* 865, 771 *P.*2d 814 (1989), in which the California Supreme Court reinforced its holding in *Elden.* In *Thing,* the mother of a child who had been struck by a car and seriously injured sought recovery for the emotional distress she suffered when, after being told about the incident, she rushed to her child's side and found him lying in the roadway. In denying the mother's right to recover in those circumstances, the court rejected the idea that foreseeability alone

should determine liability, observing that *Dillon* provided virtually no limit on liability for nonphysical harm, *id.* 257 *Cal.Rptr.* at 877–78, 771 *P.*2d at 826, and that since *Dillon,* California courts had given little consideration to avoiding the limitless exposure to liability created by the foreseeability test. *Id.* 257 *Cal.Rptr.* at 872–73, 771 *P.*2d at 821. The court stressed the need for a clear rule by which courts may determine liability, and concluded that limiting recovery to persons closely related by blood or marriage was justified because those were the people most likely to endure severe emotional distress as a result of watching a loved one suffer. *Id.* at 879–80, 771 *P.*2d at 828.

Although *Thing* clearly demonstrated the California Supreme Court's frustration with the ambitious expansion of bystander liability in the post-*Dillon* period, we note that that expansion was the product of liberal applications of the other prongs of the *Dillon* analysis, not of the intimate-familial-relationship prong. Indeed, the post-*Dillon* experience in California led one commentator to note that only the relationship prong related in any significant way to foreseeability. John L. Diamond, *Dillon v. Legg Revisited: Toward a Unified Theory of Compensating Bystanders and Relatives for Intangible Injuries,* 35 *Hastings L.J.* 477, 487–89 (1984). Thus, *Elden* and *Thing,* although surely indicating California's desire to rein in the outer limits of bystander liability, must be understood as products of California's somewhat idiosyncratic experience with the cause of action for bystander liability.

Our own experience does not parallel that of California. In general, our courts have applied all the elements of the *Dillon–Portee* test restrictively. Indeed, some of our cases applying *Portee* have interpreted the "marital or intimate familial relationship" requirement as referring to close relatives or immediate family members. *E.g., Henderson v. Morristown Memorial Hosp.,* 198 *N.J.Super.* 418, 431, 487 *A.*2d 742 (App.Div.) (noting "[t]he remedy afforded by *Portee v. Jaffee* is clearly designed to provide a recovery for plaintiff's emotional distress resulting from the death or serious bodily injury to a close relative"), *certif.*

*denied,* 101 *N.J.* 250, 501 *A.*2d 922 (1985). In *Eyrich ex rel. Eyrich v. Dam,* 193 *N.J.Super.* 244, 473 *A.*2d 539 (App.Div.), *certif. denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984), the court considered and rejected a claim for negligent infliction of emotional injury brought by a woman who had witnessed a circus leopard attack and kill the young child of a close friend and neighbor, who had been entrusted to her care for the afternoon. The woman's cause of action was based solely on her status as a bystander in witnessing the child's horrible death. The court concluded that her emotional injury would be compensable only if the court were to extend the *Portee* doctrine, which it refused to do. *Id.* at 259, 473 *A.*2d 539. Although the plaintiff had sustained severe emotional distress as an eyewitness to the fatal accident, she did not meet the relationship element of the *Portee* test because of the absence of intimate family ties between her and the victim.

We have similarly encouraged narrow applications of the other prongs of the *Dillon–Portee* test. Those restrictive applications include a requirement that the bystander contemporaneously observe both the wrongful act and its resulting harm. *E.g., Carey v. Lovett,* 132 *N.J.* 44, 62, 622 *A.*2d 1279 (1993) (ruling that father seeking to recover as bystander for malpractice that resulted in death of his child several days after the child's birth "must contemporaneously observe the malpractice and its effects on the victim"); *Frame v. Kothari,* 115 *N.J.* 638, 649, 560 *A.*2d 675 (1989) (requiring contemporaneous observation of both act of malpractice and fatal or gravely-injurious effects of that act on victim); *Johnson v. Mountainside Hosp.,* 239 *N.J.Super.* 312, 327, 571 *A.*2d 318 (App.Div.) (interpreting *Portee* as holding that "a bystander may not recover damages for emotional distress unless he has been present and has observed the actual injury inflicted on a member of his family"), *certif. denied,* 122 *N.J.* 188, 584 *A.*2d 248 (1990); *Lindenmuth v. Alperin,* 197 *N.J.Super.* 385, 484 *A.*2d 1316 (Law Div.1984) (denying recovery for emotional distress of mother from death of her child three days after the child's birth); *cf. Mercado v. Transport of New Jersey,* 176 *N.J.Super.* 234, 237, 422 *A.*2d 800 (Law Div.1980) (holding that *Portee* does not require close relative

to witness accident causing alleged emotional injury). We have likewise insisted on a strong showing that the emotional injury be severe. *E.g., Carey, supra,* 132 *N.J.* at 62, 622 *A.*2d 1279 (requiring with respect to malpractice resulting in death of newborn, that "a mother must prove that she suffered emotional distress so severe that it resulted in physical manifestations or that it destroyed her basic emotional security"; and that a father "must be shocked by the results"); *Frame, supra,* 115 *N.J.* at 643, 560 *A.*2d 675 (noting that claim based on emotional injury must be associated with aftermath of accident, "such as bleeding, traumatic injury, and cries of pain"). Moreover, our courts have acknowledged that all four prongs of the *Portee* test must be met. *E.g., Carey, supra,* 132 *N.J.* at 62, 622 *A.*2d 1279; *see Eyrich, supra,* 193 *N.J.Super.* 244, 473 *A.*2d 539.

In short, we have countenanced no rapid or radical expansion of bystander liability since *Portee.* Nothing in our experience with bystander liability counsels a departure from our accustomed application of the traditional principles of tort law. Rather, we are convinced that the solution to the posed question lies not in a hastily-drawn "bright line" distinction between married and unmarried persons but in the "sedulous application" of the principles of tort law, which inform our ultimate determination that a particular claimant is owed a duty of care. *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 254, 495 *A.*2d 107 (1985).

Although a foreseeable risk is the indispensable cornerstone of any formulation of a duty of care, not all foreseeable risks give rise to duties. The imposition of a duty is the conclusion of a rather complex analysis that considers the relationship of the parties, the nature of the risk—that is, its foreseeability and severity—and the impact the imposition of a duty would have on public policy. *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). Ultimately, whether a duty exists is a matter of fairness. *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984).

We have recognized, in numerous settings, that traditional principles of tort liability can be adapted to address areas in which recognition of a cause of action and the imposition of a duty of care are both novel and controversial. *E.g., Hopkins v. Fox and Lazo*, 132 *N.J.* 426, 625 *A.*2d 1110 (1993) (imposing duty of care on real-estate brokers with respect to safety of visitors to "open-houses"); *Weinberg v. Dinger*, 106 *N.J.* 469, 524 *A.*2d 366 (1987) (imposing duty of care on water companies to ensure adequacy of water-pressure for fire safety); *People Express Airlines, Inc., supra*, 100 *N.J.* 246, 495 *A.*2d 107 (imposing duty of care to protect against foreseeable economic losses of victim of negligence); *Kelly, supra*, 96 *N.J.* 538, 476 *A.*2d 1219 (imposing duty of care on social hosts who serve alcohol to visibly-intoxicated guests who are later involved in automobile accidents).

Although novel, applying the standard of an intimate familial relationship to an unmarried cohabitant such as Eileen Dunphy and affording her the protections of bystander liability is hardly unfair. She represents an eminently foreseeable but clearly discrete class of potential plaintiffs. Moreover, the other elements of the bystander cause of action under *Portee*—contemporaneous observation, death or serious injury to the victim, and severe emotional injury to the plaintiff—structure the kind of "particularized foreseeability" that ensures that the class is winnowed even further and that limitless liability is avoided. *People Express Airlines, Inc., supra* 100 *N.J.* at 263, 495 *A.*2d 107; *see also Hopkins, supra*, 132 *N.J.* at 451–52, 625 *A.*2d 1110 (noting that multi-factored standard defining broker's duty of care limits liability) (Clifford, J., concurring).

One can reasonably foresee that people who enjoy an intimate familial relationship with one another will be especially vulnerable to emotional injury resulting from a tragedy befalling one of them. Foreseeability based on that standard, as recognized by the Appellate Division majority, preserves the distinction that must be made between ordinary emotional injuries that would be experienced by friends and relatives in general and those "indelibly

stunning" emotional injuries suffered by one whose relationship with the victim "at the time of the injury, is deep, lasting, and genuinely intimate." 261 *N.J.Super.* at 123, 617 *A.2d* 1248. Persons engaged to be married and living together may foreseeably fall into that category of relationship. "[G]iven the widespread reality and acceptance of unmarried cohabitation, a reasonable person would not find the plaintiff's emotional trauma to be 'remote and unexpected.'" *Elden, supra,* 250 *Cal.Rptr.* at 263, 758 *P.*2d at 591 (Broussard, J., dissenting) (citation omitted).

Nor can we discern any additional, unfair burden that would be placed on potential wrongdoers in general, or, as in this case, negligent drivers. The identical acts of reasonable care that would have prevented the fatal accident that claimed the life of Michael Burwell would have preserved the emotional security of Eileen Dunphy. Certainly the extension of such a duty of care to an engaged cohabitant as a foreseeable and protectable person does not increase the burden of care or extend it beyond what is ordinarily expected and appropriate for reasonable drivers. *See Hopkins, supra,* 132 *N.J.* at 448, 625 *A.*2d 1110 (emphasizing that duty owed to potential purchasers at "open house" "arises ... when ... such an inspection is part of the professional services that would be undertaken by a reasonable broker").

Most recently, the Court in *Carey, supra,* employed traditional tort doctrine in addressing bystander liability, stating that under common-law-negligence principles, "the scope of duty depends generally on the foreseeability of the consequences of a negligent act, as limited by policy considerations and concerns for fairness." 132 *N.J.* at 57, 622 *A.*2d 1279. Such an approach, as stated by Justice Broussard in his dissent in *Elden,* recognizes that those in an intimate and familial relationship are "foreseeably and genuinely injured by a negligent defendant's acts," and allowing for their recovery "both advances the goals of tort compensation and sufficiently limits liability. To that end, a standard based on the significance and stability of the plaintiff's relationship is workable

and fair." *Elden, supra,* 250 *Cal.Rptr.* at 265, 758 *P.*2d at 593 (Broussard, J., dissenting). We agree.

■ Central to a claim under bystander liability is the existence of an intimate familial relationship and the strength of the emotional bonds that surround that relationship. The harm precipitating emotional distress must be so severe that it destroys the emotional security derived from a relationship that is deep, enduring, and intimate. The quality of the relationship creates the severity of the loss. As we said in *Portee,* "no loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of death or serious bodily injury to one of those whose very existence is a precious treasure." 84 *N.J.* at 97, 417 *A.*2d 521.

Our courts have shown that the sound assessment of the quality of interpersonal relationships is not beyond a jury's ken and that courts are capable of dealing with the realities, not simply the legalities, of relationships to assure that resulting emotional injury is genuine and deserving of compensation. Thus, "to achieve substantial justice in other cases, we have adjusted the rights and duties of parties in light of the realities of their relationship." *Crowe v. De Gioia,* 90 *N.J.* 126, 135, 447 *A.*2d 173 (1982); *see Kozlowski v. Kozlowski,* 80 *N.J.* 378, 403 *A.*2d 902 (1979) (recognizing the enforceability of support agreement between non-married cohabitants based on consideration of longstanding close personal relationship). Likewise, each time a court or jury assesses damages for loss of consortium, the quality of the relationship and thus the severity of the loss must be inquired into by the factfinder. *See, e.g., Bendar v. Rosen,* 247 *N.J.Super.* 219, 228, 588 *A.*2d 1264 (App.Div.1991); *see also Carr v. Carr,* 120 *N.J.* 336, 352, 576 *A.*2d 872 (1990) (applying principles of quasi-contract to protect rights acquired as "a result of enduring, intimate personal relationships founded on mutual trust, dependence, and raised expectations").

The task of exploring and evaluating an interpersonal relationship when necessary to adjudicate claims arising from that rela-

tionship poses no special obstacles in the context of bystander liability. As noted by the Appellate Division:

> Irrespective of the label placed upon a particular relationship, it is a jury question whether the inter-personal bonds upon which the cause of action is based actually exist. A defendant should always have the right, even in the case of a parent and child or a husband and wife, to test the operative facts upon which the claim is based irrespective of the *de jure* relationship.
>
> [261 *N.J.Super.* at 122, 617 *A.*2d 1248.]

We acknowledge that this critical determination must be guided as much as possible by a standard that focuses on those factors that identify and define the intimacy and familial nature of such a relationship. That standard must take into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and, as expressed by the Appellate Division, "whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements." *Id.* at 123, 617 *A.*2d 1248.

Unlike the dissent, *post* at 107, 642 *A.*2d at 376, we are unpersuaded by the concerns of the California court expressed in *Elden* and *Thing* that without a "bright line" definition of the bystander-victim relationship, courts will not be able to counteract fraudulent and meretricious claims. That consideration does not outweigh the need to recognize claims that are legitimate and just. *Pieters v. B–Right Trucking, Inc.,* 669 *F.Supp.* 1463, 1471 (N.D.Ind.1987) (noting that "[a]n award of damages for emotional distress resulting from the injuries and death of a future husband is anything but fraudulent"). We agree with the Appellate Division that

> [t]o foreclose such a plaintiff from making a claim based upon emotional harm because her relationship with the injured person does not carry a particular label is to work a potential injustice, not only in this case but also in too many other instances in which the events leading to injury or death are indelibly stunning, and where the emotional injury is genuine and substantial and is based upon a relationship of significant duration that, at the time of injury, is deep, lasting and genuinely intimate.
>
> [*Ibid.*]

The California court also feared that the allowance of a cause of action under such circumstances would intrude on the privacy of the parties. *Elden, supra,* 250 *Cal.Rptr.* at 259–60, 758 *P.2d* at 587. Of course, even if the persons are married, probing inquiry into the nature of their relationship will nonetheless occur. That does in fact happen in many other contexts. See, *e.g., Crowe, supra,* 90 *N.J.* 126, 447 *A.*2d 173 (examining personal relationship for purposes of equitable distribution); *Bendar, supra,* 247 *N.J.Super.* 219, 588 *A.*2d 1264 (evaluating loss of consortium claim on basis of nature of personal relationship). Moreover, the fact that people are unmarried does not make that inquiry any more intrusive or problematic. *Pieters, supra,* 669 *F.Supp.* at 1471 (noting that "[p]roving damages will be no more difficult if [the plaintiff] recovers for the distress caused by her fiance's injuries and death").

The imposition of a duty of care, we have said, must not only be fair, it must accord with sound public policy. *Kelly, supra,* 96 *N.J.* at 544, 476 *A.*2d 1219; *Goldberg, supra,* 38 *N.J.* at 582, 186 *A.*2d 291. We do not find that bystander liability in favor of unmarried persons who enjoy an intimate familial relationship that is substantial, stable, and enduring is inimical to concerns of public policy.

We reject California's belief that the State's strong interest in promoting marriage will be subverted if unmarried cohabitants are given the same rights as married persons with respect to the right to recover for the negligent infliction of emotional injury. *Elden, supra,* 250 *Cal.Rptr.* at 258–59, 758 *P.2d* at 586. In his dissent, Justice Broussard correctly argues that allowing recovery will not undermine the State's interest in promoting marriage, because "[p]resumably, a person who would not otherwise choose to marry would not be persuaded to do so in order to assure his or her legal standing in a future personal injury action should that person have the misfortune of witnessing the serious injury of his or her spouse." *Id.* 250 *Cal.Rptr.* at 263, at 591.

We concur in that view. The State's interest in marriage would not be harmed if unmarried cohabitants are permitted to prove on a case-by-case basis that they enjoy a steadfast relationship that is equivalent to a legal marriage and thus equally deserves legal protection. Marriage will still maintain its preferential status under the law. Allowing tort recovery in circumstances such as these—for persons who have developed an emotional security from a sound and strong relationship—will not discourage marriage as a worthwhile and desirable relationship or erode society's commitment to the institution of marriage. *Crowe, supra,* 90 *N.J.* 126, 447 *A.*2d 173; *Kozlowski, supra,* 80 *N.J.* 378, 403 *A.*2d 902 (recognizing enforceability of support agreements made between cohabitants to extent not based on relationship proscribed by law or promise to marry).

Nor are we persuaded that allowing engaged cohabitants to recover will have a significant adverse effect on automobile insurance premiums sufficient to undermine any considerations of public policy, as argued by defendant. *Frame, supra,* 115 *N.J.* at 650, 560 *A.*2d 675 (concluding that "any added cost to the medical profession from the recognition of such a claim [for emotional distress based on bystander liability] is outweighed by the suffering of severe emotional distress from the shock of observing a misdiagnosis that results in immediate injury to a loved one"). No empirical evidence supports such a claim.

Finally, we have no sense that the application of bystander liability to an engaged cohabitant constitutes an avulsive expansion of tort liability. The recognition of the justness and fairness of such a cause of action is shared by other jurisdictions. Some courts prefer to require a strict blood relationship between the plaintiff and the victim for the plaintiff to maintain a cause of action. *E.g., Sollars v. City of Albuquerque,* 794 *F.Supp.* 360, 363–64 (D.N.M.1992); *Elden, supra,* 250 *Cal.Rptr.* 254, 758 *P.*2d 582; *Ferretti v. Weber,* 513 *So.*2d 1333 (Fla.Dist.Ct.App.), *cause dismissed,* 519 *So.*2d 986 (Fla.1987); *Barnhill v. Davis,* 300 *N.W.*2d 104, 107–08 (Iowa 1981); *Trombetta v. Conkling,* 187

*A.D.*2d 213, 593 *N.Y.S.*2d 670, 671 (1993). Other states, however, focus on the nature and integrity of the relationship and have held that a blood tie between the plaintiff and the victim need not exist for bystander recovery. *See Pieters, supra,* 669 *F.Supp.* at 1471; *Leong v. Takasaki,* 55 *Haw.* 398, 520 *P.*2d 758, 760, 766 (1974); *James v. Lieb,* 221 *Neb.* 47, 375 *N.W.*2d 109, 115 (1985); *Paugh v. Hanks,* 6 *Ohio St.*3d 72, 78–81, 451 *N.E.*2d 759, 766–67 (1983); *Sinn v. Burd,* 486 *Pa.* 146, 404 *A.*2d 672, 695 (1979); *Heldreth v. Marrs,* 188 *W.Va.* 481, 425 *S.E.*2d 157, 162–63 (1992). That latter view comports with our own.

## III

We conclude that under the circumstances of this case an unmarried cohabitant should be afforded the protections of bystander liability for the negligent infliction of emotional injury. The basis for that protection is the existence of an intimate familial relationship with the victim of the defendant's negligence.

An intimate familial relationship that is stable, enduring, substantial, and mutually supportive is one that is cemented by strong emotional bonds and provides a deep and pervasive emotional security. We are satisfied that persons who enjoy such an intimate familial relationship have a cognizable interest in the continued mutual emotional well-being derived from their relationship. When that emotional security is devastated because one witnesses, in close and direct proximity, an accident resulting in the wrongful death or grievous bodily injury of a person with whom one shares an intimate familial relationship, the infliction of that severe emotional injury may be the basis of recovery against the wrongdoer.

The judgment of the Appellate Division is affirmed.

GARIBALDI, J., dissenting.

I would reverse, not because I disagree with the majority's basic assumption that an unmarried cohabitant will not suffer the same

emotional distress at the tragic death of her companion that she would have suffered if she were married to the victim of a fatal accident, but because I perceive no sufficiently limiting principle in the majority's standard for deciding who qualifies as an intimate family member. I do not doubt that many couples who live together without formal marriage are bound by "emotional ties as strong as those that bind formally married partners." *Elden v. Sheldon*, 46 *Cal.*3d 267, 250 *Cal.Rptr.* 254, 258, 758 *P.*2d 582, 586 (1988). Yet, "The same would often be true of very close friends." *Ibid.* A demonstrable strength of emotional ties and a real potentiality of severe emotional trauma, however, do not and should not end our inquiry.

For example, in *Portee v. Jaffee*, 84 *N.J.* 88, 417 *A.*2d 521 (1980), we held that to maintain a claim for negligent infliction of emotional distress a parent actually had to witness the accident that had resulted in her son's death. We did not believe that Mrs. Portee would not have experienced severe emotional trauma had she only heard an account of the tragic accident that befell her son. Rather, we recognized that the class of persons able to recover for the tort of negligent infliction of emotional distress as a bystander had to be limited. We, therefore, set forth a four-factor test that a bystander-claimant would have to demonstrate to prevail: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between the plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." 84 *N.J.* at 101, 417 *A.*2d 521.

In developing the *Portee* test, we relied on the decision of the California Supreme Court in *Dillon v. Legg*, 68 *Cal.*2d 728, 69 *Cal.Rptr.* 72, 441 *P.*2d 912 (1968). As the dissent below correctly noted, the California Supreme Court "has since rejected an expansion of the cause of action to a cohabitant relationship with similarities to a marital relationship." 261 *N.J.Super.* at 125, 617 *A.*2d 1248 (Muir, J.A.D., dissenting); see *Elden, supra*, 250 *Cal. Rptr.* 254, 758 *P.*2d 582 (holding that unmarried cohabitant could

not recover for negligent infliction of emotional distress as by-stander).  In its decision today, the majority attempts to distin-guish our experience in New Jersey from the California experi-ence by noting that "[a]fter *Dillon,* California courts had expanded nearly all the boundaries of liability set out in the several prongs of the *Dillon* analysis."  *Ante* at 105, 642 *A.*2d at 375.

I agree that we have hitherto construed all the elements of the *Dillon–Portee* test narrowly.  Unlike the majority, I would contin-ue to do so.  I believe that the majority's opinion will substantially expand the numbers of those seeking recovery for bystander emotional distress.  I perceive no public policy reason to support such an increase.  Moreover, I think it will cause confusion in many other areas of the law in which spouses continue to be treated differently from unmarried cohabitants.

## I

The *Elden* majority determined that courts must draw a bright line to limit the scope of liability of a negligent actor.  As the *Elden* Court stated, no principled distinction exists between *de facto* spouses, *de facto* siblings, *de facto* parents, *de facto* grand-parents, or *de facto* children.  250 *Cal.Rptr.* at 260–61, 758 *P.*2d at 588.  "The 'problems of multiplication of actions and damages' [sic] that would result from such an extension of liability would place an intolerable burden on society."  *Ibid.* (quoting *Borer v. American Airlines,* 19 *Cal.*3d 441, 138 *Cal.Rptr.* 302, 308, 563 *P.*2d 858, 864 (1977)).

Where we draw the line is "ultimately a question of fairness." *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521 (quoting *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962)).  The proper analysis should include a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.  *Goldberg, supra,* 38 *N.J.* at 583, 186 *A.*2d 291. We should adopt a rule that clearly delineates the scope of liability and clearly defines those persons who may seek redress within the judicial system.  Although such a rule of thumb should guide the

Court in its analysis of all common-law causes of action, the Court should apply it with added vigor in the context of causes of action for negligent infliction of emotional distress because emotional injuries, unlike physical injuries, are hard to define and the number of potential claimants is virtually limitless.

The majority thinks that excluding unmarried cohabitants from the class of eligible plaintiffs for bystander negligent infliction of emotional distress is arbitrary line-drawing. I agree, but a certain degree of arbitrariness is necessary in setting the outer limits of tort liability in general and in setting the outer limits of liability in the field of emotional distress in particular. As Justice Pollock reminded us in *Frame v. Kothari*, 115 *N.J.* 638, 649, 560 *A.*2d 675 (1989), "Whenever a court draws lines, it risks the criticism of arbitrariness. Drawing lines, however, is the business of the courts and lines must be drawn to provide remedies for wrongs without exposing wrongdoers to unlimited liability."

Moreover, "Everyone is subject to injury, disease, and death. Common experience teaches that the injury or death of one member of a family often produces severe emotional distress in another family member." *Id.* at 642, 560 *A.*2d 675. Yet, *Portee* arbitrarily required that to recover for negligent infliction of emotional distress, plaintiffs had to be actual bystanders to the death or injury of another. Does anyone believe that a mother who is told that her child was killed crossing the street, or that a mother who witnesses the prolonged agony of her child dying as a result of a car accident that she did not see, suffers less emotional distress than the mother who was present at the scene of the accident?

We limit recovery to actual bystanders because

[e]motional distress is an intangible condition experienced by most persons, even absent negligence, at some time during their lives. Close relatives suffer serious, even debilitating, emotional reactions to the injury, death, serious illness, and evident suffering of loved ones.... That relative will have severe emotional distress is an unavoidable aspect of the "human condition". * * * The overwhelming majority of "emotional distress" [that] we endure, therefore, is not compensable.

[*Thing v. La Chusa,* 48 *Cal.*3d 644, 257 *Cal.Rptr.* 865, 880, 771 *P.*2d 814, 828–829 (1989).]

As defendant aptly points out, however, wherever the line is drawn, one can always find someone outside the line who arguably should be inside. For instance, if engaged cohabitants may recover, one could argue that engaged couples who do not cohabitate also should be allowed to recover. One could also argue that lifelong friends also should be allowed to recover? However, allowing such recovery would bring us closer to limitless liability, which we reject.

## II

I believe, as did the dissenting judge below, that *Portee* meant to limit the class of plaintiffs eligible to recover for bystander emotional distress to those bystanders with a marital or blood relationship to the victim of the accident. Indeed, the plain language of *Portee,* "marital *or* intimate familial relationship," 84 *N.J.* at 101, 417 *A.*2d 521 (emphasis added), supports that interpretation. In fact, most of the cases have interpreted the *Dillon–Portee* "marital or intimate familial relationship" requirement as referring only to close relatives or immediate family members. *E.g., Johnson v. Mountainside Hosp.,* 239 *N.J.Super.* 312, 327, 571 *A.*2d 318 (App.Div.) (interpreting *Portee* as holding that "a bystander may not recover damages for emotional distress unless he has been present and has observed the actual injury inflicted on a member of his family"), *certif. denied,* 122 *N.J.* 188, 584 *A.*2d 248 (1990); *Henderson v. Morristown Memorial Hosp.,* 198 *N.J.Super.* 418, 431, 487 *A.*2d 742 (App.Div.) (noting that "[t]he remedy afforded by *Portee v. Jaffee* is clearly designed to provide a recovery for plaintiff's emotional distress resulting from the death or serious bodily injury to a close relative"), *certif. denied,* 101 *N.J.* 250, 501 *A.*2d 922 (1985); *Eyrich ex rel. Eyrich v. Dam,* 193 *N.J.Super.* 244, 473 *A.*2d 539 (App.Div.) (holding that close friend and neighbor of young child killed by circus leopard when entrusted to her care could not recover for negligent infliction of emotional distress), *certif. denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984).

## III

In addition to limiting the scope of the tort of negligent infliction of emotional distress, other valid public policy reasons argue in favor of excluding unmarried cohabitants from the class of persons eligible to recover for negligent infliction of emotional distress. Drawing the line at marriage conforms to the general expectation of society as reflected in the statutes of New Jersey that spouses should be treated differently than unmarried cohabitants. The New Jersey Legislature abolished common-law marriage in 1937. See *N.J.S.A.* 37:1–10. Although social mores have changed since 1937, the Legislature has not reauthorized common-law marriage. Thus, the legal distinction between the duties and responsibilities of married and unmarried cohabitants remains. Moreover, the underlying rationale for the abolishment of common-law marriage still exists:

> Inherent in the common law marriage are a non-recognition of the legal process, and a lack of commitment which often gives rise to an impermanent and ephemeral arrangement, such that economic support, let alone dependency, may be withheld randomly. The union, which in the eyes of the public remains an uncertainty, may dissolve at any time. Such a couple may not both use an identical surname, file joint tax returns, or be deemed an entity for census-taking, welfare or social security eligibility.
>
> [*Parkinson v. J. & S. Tool Co.*, 64 *N.J.* 159, 163, 313 *A.2d* 609 (1974).]

Thus, unmarried cohabitants, regardless of their demonstrable level of commitment for one another, continue to be treated differently than spouses for the purposes of the administration of benefits under workers' compensation and insurance policies.

The distinction between the treatment of spouses and unmarried cohabitants is apparent in other areas of the law. For example, unlike spouses, unmarried cohabitants cannot inherit by intestate succession. *N.J.S.A.* 3B:5–3; *see Newburgh v. Arrigo*, 88 *N.J.* 529, 541, 443 *A.2d* 1031 (1982) (declining to find wife-in-fact to be "heir"). Unmarried cohabitants also are not allowed to recover for wrongful death under *N.J.S.A.* 2A:31–4, the Wrongful Death Act. *See Sykes v. Propane Power Corp.*, 224 *N.J.Super.* 686, 697, 541 *A.2d* 271 (App.Div.1988) (holding that plaintiff's status as unmarried cohabitant barred her claim for wrongful

death); *Cassano v. Durham*, 180 *N.J.Super.* 620, 626, 436 *A.*2d 118 (Law Div.1981) (holding that plaintiff who cohabitated with decedent without marriage was not "surviving spouse" within meaning of intestacy statute and therefore could not recover under Wrongful Death Act). Only spouses, and not unmarried cohabitants, can receive alimony. *See Crowe v. De Gioia*, 90 *N.J.* 126, 132, 447 *A.*2d 173 (1982) (holding that alimony-authorization statute, *N.J.S.A.* 2A:34-23, does not embrace action on contract between unmarried cohabitants). *N.J.S.A.* 44:1-140(a) requires spouses to support each other, but, absent an agreement to the contrary, one unmarried cohabitant can walk out on the other without any notice or restrictions. *Cf. Kozlowski v. Kozlowski*, 80 *N.J.* 378, 386-87, 403 *A.*2d 902 (1979) (finding that enforcement of an agreement between two unmarried parties is far different from creating new cause of action in favor of an unmarried cohabitant).

Furthermore, in *Portee, supra*, we noted that the causes of action for loss of consortium and for negligent infliction of emotional distress are quite similar. 84 *N.J.* at 98 n. 6, 417 *A.*2d 521. Nonetheless, although spouses may recover for loss of consortium, unmarried cohabitants cannot. *Leonardis v. Morton Chem. Co.*, 184 *N.J.Super.* 10, 11, 445 *A.*2d 45 (App.Div.1982). The refusal to allow claims for loss of consortium in the absence of a marriage is based on a number of sound policy considerations, which apply equally well to the present case. *See Schroeder v. Boeing Commercial Airplane Co.*, 712 *F.Supp.* 39, 42-43 (D.N.J.1989). Perhaps most persuasive is the recognition that once the cause of action no longer depends on the marital status, no clear principle exists to limit liability at all. "[O]n social policy grounds, liability at some point must be delimited." *Id.* at 42.

"If a loss of consortium were to be extended to include unmarried individuals, the certainty of who is entitled to prosecute such a claim is destroyed.... Friends and relatives may also suffer a loss of society and companionship when an endeared one is injured. To compensate for such losses, however, would involve costs far beyond those society can afford."

[*Ibid.* (quoting *Denil v. Integrity Mutual Ins. Co.*, 135 *Wis.*2d 373, 401 *N.W.*2d 13, 15 (Ct.App.1986)).]

## IV

Public policy reasons aside, I would still object to the majority's decision today because it adopts an unworkable and ultimately unwise standard for determining who may qualify as a plaintiff in bystander emotional-distress actions. The majority's decision will open the door to more bystander claims because many people live together in "significant other" relationships. The inquiry into whether a bystander has the requisite "close, substantial, and enduring relationship" will require the courts and defendants to delve into the intimate details of claimants' lives. The proofs will undoubtedly deal with a couple's sexual fidelity, their commitment to one another measured in time intervals, their economic interconnectedness and interdependence, not to mention their estate plans. Undoubtedly, speculation will arise regarding the particulars of a couple's day-to-day relationship and the manner in which the couple relates to one another in attending to life's mundane requirements. See *ante* at 112, 642 *A*.2d at 378. Yet, in the end, only the two people involved in the relationship really know how close and stable their relationship is. In the majority of bystander emotional-distress actions, however, only the bystanding survivor will be available to disclose the details of the relationship. Clearly, the defendants will be at a disadvantage. That disadvantage can be recouped only through lengthy, expensive, and intrusive investigations.

Those are precisely the reasons that the California Supreme Court cited in declining to extend the tort of negligent infliction of emotional distress to cover unmarried cohabitants. In its words,

A determination whether a partner in an unmarried cohabitation relationship may recover damages for emotional distress based on such matters as the sexual fidelity of the parties and their emotional and economic ties would require a court to undertake a massive intrusion into the private life of the partners. Further, application of these factors would not provide a sufficiently definite and predictable test to allow for consistent application from case to case.

[*Elden, supra*, 250 *Cal.Rptr.* at 260, 758 *P*.2d at 587.]

And although I applaud the Court's effort to impose standards that must be met before an unmarried cohabitant may prevail in a

bystander action, the standards remain necessarily open-ended. The end result will be that courts will be forced to evaluate all sorts of personal relationships and necessarily assign to them a rank in some large hierarchy. Ranking relationships is not our role. As eloquently noted in *Childers v. Shannon*, 183 *N.J.Super.* 591, 595, 444 *A.*2d 1141 (Law Div.1982),

> It is not the function of this court to sift through the myriad relationships of a party in a negligence action to determine which of those near and dear have suffered an injury proximately caused by tortious conduct. Should this court allow this plaintiff's claim for loss of consortium, other courts will be forced to determine which plaintiffs have relationships sufficiently meaningful to entitle them to claim consortium. Plaintiffs here were engaged to be married at the time of the accident; how long an engagement will support a claim? One month? One week? "Going steady"? Or is cohabitation to be the test, as it apparently was in *Bulloch?* Again: For how long? Was there joint payments of rent? Grocery bills?

## V

As Chief Justice Wilentz and I noted in a prior case involving negligent infliction of emotional distress, "We acknowledge that the trend of the prior decisions in the area of bystander emotional distress has been to expand liability. It is not, however, the trend, but the social policy underlying it, that should guide the development of the common law." *Frame, supra,* 115 *N.J.* at 638, 560 *A.*2d 675 (concurring opinion).

Again, I have no disagreement with the majority's basic assumption that a person involved in "an intimate familial relationship that is stable, enduring, substantial, and mutually supportive [and] is cemented by strong emotional bonds and provides a deep and pervasive emotional security" will suffer as much emotional distress on the death of his or her partner as a spouse. See *ante* at 115, 642 *A.*2d at 380. Nevertheless, the need to draw clear lines in this area of the law, coupled with the expensive and undoubtedly arduous task of proving which relationship meets the majority's standards, compels me to vote to reverse.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and STEIN—5.

*For reversal*—Justice GARIBALDI—1.